**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| J.B.H., on behalf of himself and all others similarly situated, by his next friend Debra Medlock, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| KNOX COUNTY, CHIEF JUDGE RAYMOND A. CAVANAUGH of the Ninth Judicial Circuit Court, BRIDGET E. PLETZ, Director of Court Services of the Ninth Judicial Circuit Court, and WENDI L. STECK, Superintendent of the Mary Davis Home, | ) ) ) ) ) ) ) ) ) ) | Hon. _____ |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff J.B.H., on behalf of himself and all others similarly situated, by and through his undersigned counsel and next friend, hereby files this Class Action Complaint against Defendants Knox County ("County"), Chief Judge Raymond Cavanaugh, Bridget E. Pletz, and Wendi Steck, (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.　　Mary Davis Detention Home ("MDH" or "the Center") detains children as young as 11 years old. The children who make their way to the Center are a uniquely vulnerable population; many have suffered abuse and trauma in their lives and face significant mental health issues that predate their incarceration. Once detained, these children are under Defendants' exclusive, full-time care at a crucial point in their physical, psychological, educational, and social development. MDH has the responsibility of raising these children for the time they are within the walls of the facility. But instead of caring for them, Defendants subject them to inhumane

conditions of confinement that are well known to cause lasting harm, especially to the young.

2.      Children at MDH spend the majority of their time in solitary confinement. Day in and day out, these children spend at least nineteen to twenty hours per day confined in their cells. Defendants often enhance this already excessive confinement, imposing twenty-three-hour-a-day solitary confinement as a form of punishment. They also place youth on "Behavioral Plans" that involve punitive confinement of twenty-one to twenty-two hours per day. These punishments are often imposed for multiple consecutive days at the whim of jail staff, often without notice or any explanation as to when the punishment will end. Defendants maintain this culture of solitary confinement in the face of the extensive and settled body of research showing that the practice inflicts immeasurable harm on children and is wholly inappropriate in a juvenile detention setting.

3.      The harm of solitary confinement is amplified by the conditions in which the children are detained. The fluorescent lights in their cells are never turned off, making sleep difficult to impossible. Children have long been forced to eat meals alone in their cells, just a few steps away from the toilet where they have to defecate. The meals they consume are nutritionally inadequate, with youth on punitive confinement forced to eat the worst food of all. While confined, children are cruelly denied basic human interaction, let alone the kind of activities and programming they should be receiving. They are left to pace their tiny, brightly lit concrete cells alone for days, weeks, or even months.

4.      Children at MDH have limited access to mental health care, which is a significant concern given the complex needs of the youth in detention. There are no mental health professionals on staff at the facility. There is one social worker who visits the children 2-3 times per week but is not equipped to provide the kind of urgent mental health intervention these children need. The most vulnerable children are only given access to the social worker for fifteen minutes

at a time, all within earshot of the other youth present in their living area.

5.      The children at MDH are denied anything resembling an education during their time at the Center. Their "school" consists of self-guided worksheets that they complete on their own, often in their living areas steps from their cells. When they occasionally visit the facility's classroom it is only to complete the worksheets in a different place. There are no special education services for youth who need them. Many youth go days or weeks without any schoolwork at all.

6.      Children at MDH have long been subjected to strip searches as well. Traumatic, invasive, fully naked strip searches are a routine part of life at MDH, frequently conducted without any individualized suspicion. Youth are often subjected to facility-wide strip searches that necessarily invade the privacy and bodily sovereignty of, and inflict trauma on, a far broader group of youth than necessary.

7.      Defendants have maintained these conditions in the face of multiple public warnings that the facility is an unfit environment for children. The Illinois Department of Juvenile Justice, which is responsible for auditing juvenile detention centers in the state, has warned MDH over and over that its extensive isolation of youth is inappropriate. The State has warned that confinement is not to be used for punishment, and youth should be confined only for very short time periods in extreme circumstances. Yet the facility continues to confine youth to their rooms for days and even weeks at a time, with full knowledge that it is a prohibited practice and creates substantial risks of serious harm for the children in their care.

8.      IDJJ has further warned MDH about its inadequate educational services, blanket use of strip searches, use of force, and inadequate mental health care; all these problems have persisted. The facility refuses to reform its practices despite public condemnation and state oversight. At least two other State agencies have also publicly rebuked MDH's detention practices

and conditions.

9.      MDH's poor conditions are directly attributable to the County's policy of knowingly allowing MDH to continue to operate as a facility structured around solitary confinement, and its failure to provide adequate mental health staffing to at least mitigate the harms caused by the persistent isolation it knows to be the norm at MDH. The remaining Defendants supervise and oversee the abusive day-to-day environment that festers in a facility that resolutely refuses to allow the children in its custody more than fleeting respite from maddening solitary confinement.

10.     The history of MDH teaches that the current unconstitutional conditions will persist unless this Court stops them. The named Plaintiff, and the putative class of detained children described below, seek declaratory and injunctive relief requiring Defendants to provide constitutionally adequate conditions of confinement at MDH, including mental health and educational services.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action presents federal questions and seeks to redress the deprivation of rights under the Eighth, Fourth, and Fourteenth Amendments to the U.S. Constitution.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims asserted herein occurred within this judicial district.

13.     This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

14.     Plaintiff J.B.H. is a 17-year-old boy who is currently detained at MDH. Plaintiff

J.B.H. is identified by his initials in accordance with Federal Rule of Civil Procedure 5.2 because he is a minor at the time of this action. J.B.H. has been detained at MDH since around March 29, 2024, when he was last admitted. He appears in this action through his guardian, Debra Medlock. J.B.H. sues on his own behalf and on behalf of the putative class.

15. Defendant Wendi Steck is the Superintendent of MDH. Defendant Steck is the official responsible for the management of the Center's daily operations. Defendant Steck is responsible for supervising and training MDH staff and ensuring the safety and well-being of all children in custody on a day-to-day basis. Defendant Steck is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. Defendant Steck is sued in her official capacity.

16. Defendant Chief Judge Raymond Cavanaugh of the Ninth Judicial Circuit Court is the official statutorily authorized to have administrative and supervisory authority over MDH. In this role, Defendant Chief Judge Cavanaugh is responsible for overseeing, directing, and ensuring the safe, secure, and efficient operation of the facility. On information and belief, Defendant Chief Judge Cavanaugh, along with Defendant Pletz and Defendant Knox County, is responsible for hiring an adequate number of staff at the facility, including the Superintendent, to operate the Center. Defendant Chief Judge Cavanaugh is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. Defendant Chief Judge Raymond Cavanaugh is sued in his official capacity.

17. Defendant Bridget Pletz is the Director of Court Services for the Ninth Judicial Circuit Court, and oversees the administration and supervision of MDH along with Defendant Chief Judge Raymond Cavanaugh. On information and belief, Defendant Pletz is responsible for assisting with hiring jail staff, including the Superintendent, as well as evaluating the

Superintendent's performance. Defendant Pletz is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. Defendant Pletz is sued in her official capacity.

18.    Defendant Knox County (the "County") is the unit of local government that chose, through its governing body the Knox County Board (the "Board"), to build MDH and that is responsible for continuing to fund and maintain it. On information and belief, the County, acting through the Board, is responsible for the facility's budget and finances, including establishing an annual budget for the Center's operation and paying its debt service. The County is responsible for paying staff salary and benefits, as well as hiring individuals or independent contractors to provide necessary support services at the facility, including the Center's health care delivery system. The County is responsible for providing all essential equipment and supplies for the Center's operation, as well as the expense of training staff. The County is also responsible for ensuring that the facility complies with the Illinois Department of Juvenile Justice's juvenile detention center standards. The County, acting through its Board, has final policymaking authority for MDH.

19.    Defendants each establish and have responsibility for establishing policy, custom, and practice that shape the lives of the children detained at MDH.

## BACKGROUND

20.    MDH is a 39-bed facility in Galesburg, Illinois. Each year, it houses dozens of children between the ages of 11 and 17 from multiple counties across Illinois.

21.    Children detained at MDH have, for the most part, not been adjudicated delinquent or convicted of the crime for which they were arrested. Youth in MDH are locked in the facility while they wait for trial, sentencing, and/or transfer to another facility.

22.    The children at MDH are housed in four separate housing pods labeled Upper East,

Lower East, Upper West, and Lower West. These pods are single-occupancy cells. The facility has also used a fifth housing pod—referred to as the "Harvest Wing"—as a dedicated punitive confinement area the children refer to as "Seg," though MDH has paused use of the Harvest Wing after negative attention from the IDJJ's 2022 and 2023 audits. The facility did not end the practice of punitive confinement; instead, the facility merely moved segregated solitary confinement from a dedicated wing back to youth living spaces, where youth endure punitive extended solitary confinement in their own cells.

23.    The cells in each pod are arranged around a common hallway area which includes a small couch and in some cases a television attached to one wall. Between the pods is a central control booth with an intercom that allows two-way communication between the children in the cells and the jail staff stationed in the control booth. However, MDH staff do not allow children to use the intercom, forcing children to resort to shouting and yelling to get staff attention.

24.    The population of children detained at MDH varies over time, though there are typically 15 to 25 children at MDH on any given day.

25.    Children are often held at MDH for weeks at a time. It is not uncommon for youth to be locked in MDH for multiple months, or even a year or more.

**I.      MDH Detains Children in Unconstitutional Conditions**

26.    MDH's conditions are shockingly inadequate and affirmatively abusive.

27.    Three youth currently or recently detained at the facility for extended periods of time—J.B.H., N.J., and M.P.—experienced these conditions first-hand.

**A.      J.B.H.'s Experience at MDH**

28.    Plaintiff J.B.H. is a 17-year-old boy from Rock Island, Illinois who has been detained multiple times at MDH over the past three years. He has spent approximately six months

at the facility during that time. J.B.H. currently lives at the facility, where he has been detained since approximately March 2024. J.B.H. was also detained at MDH for about a month in December 2021, and for about two months in early 2022. The third time was for around a month in April 2022, and the fourth was in late 2022. *See* Declaration of J.B.H. ("J.B.H. Decl."), attached hereto as Exhibit 1, at ¶ 2.

29.     Although he has lived in all of the different living pods throughout the facility, J.B.H. is currently housed in Lower East pod, where he is detained with approximately 3 other children at the time of filing. *Id.* at ¶ 4.

30.     J.B.H. spends almost all his time in his cell at MDH. J.B.H. spends a minimum of about 23 hours per day in his cell right now and has for at least 2 weeks. *Id.* at ¶ 6. J.B.H. was placed on "Special Group Status," or "SGS," as punishment for refusing to return to his cell after staff refused to give him his medication. *Id.* at ¶ 7.

31.     SGS is a punishment that involves staff placing youth in their cell for extended solitary confinement with no escape save for a brief shower and two short "recreation" periods of about 15-30 minutes each. *Id.* at ¶ 6. MDH staff dictate the location and activities for these limited recreation times. *Id.* at ¶ 14. For instance, on May 24, 2024, in the early afternoon, J.B.H. mentioned that it was his first time out of his cell all day and he returned to his cell after the legal visit, as staff considered his legal visits and calls to be part of his "rec" time. *Id.* at ¶ 13. Children on SGS eat all their meals in their cells. *See id.* at ¶ 6.

32.     Staff have not told J.B.H. when he can expect his SGS status to end. *Id.* at ¶ 7. According to J.B.H. believes there were about five other youth on SGS restriction at the time counsel spoke with J.B.H. shortly before filing. *Id.* at ¶ 8. In J.B.H.'s experience SGS status can last anywhere from 1 day to 3 months. *Id.* at ¶ 7.

33.     In J.B.H.'s experience, kids get placed on SGS restriction for a variety of reasons. He has seen kids placed on SGS restriction for cussing at staff. *Id.* at ¶ 7. J.B.H. says the staff can place kids on SGS for whatever they want. *Id.*

34.     J.B.H. is incredibly bored when locked alone in his cell. *Id.* at ¶ 11. There is nothing to do but walk back and forth and stare at the wall, particularly because he is not allowed any books while on SGS restriction. *Id.* He is forced to eat by himself in his cell, with a plate of food handed to him three times a day and picked up by staff later. *Id.* Staff tell youth they are not allowed to talk between cells and can discipline them if they are caught communicating. *Id.* at ¶ 11. But this kind of contact is important to J.B.H.—talking through cell doors is almost all the human contact he is allowed, particularly when he is on SGS restriction. *Id.* The only other human contact J.B.H. has is with staff during food drop-offs and occasional wellness checks. *Id.*

35.     J.B.H. is a naturally high-energy person and sitting in his cell for hours on end "messes with [his] head." *Id.* at ¶ 11. He feels that his extended isolation is really hurting his mental health; he sometimes cries when he is alone in his cell and feels hopeless and depressed, like there is no escape. *Id.* at ¶¶ 11, 34. J.B.H. says that the facility is making him go crazy. *Id.*

36.     SGS restriction is not the only enhanced solitary confinement MDH staff use to punish youth. Youth can also be placed on "behavior plans," which involves extended confinement in their cells. *See id.* at ¶ 9. Although they can come out of their cells during regular recreation time, they are restricted from engaging in typical recreational activities. Instead, they must complete their "plan," which includes completing paperwork and participating in meetings with staff. *See id.* J.B.H. has been on a behavior plan at least four times during his recent stay at the Center. *Id.* at ¶ 10.

37.     Even before he was placed on SGS restriction J.B.H. spent the vast majority of each

day at MDH alone in his cell. *Id.* at ¶ 12. He came out of his cell for recreation periods, meals, showers and school for a total of about three hours per day. *Id.* The other twenty to twenty-one hours were spent in his cell in the same way as during SGS restriction. *Id.*

38.    J.B.H.'s cell, where he now spends the majority of his young life, is not a comfortable place. It is a concrete box that barely allows him enough room to walk around. *See id.* at ¶ 16. It has fluorescent lights on the ceiling that never turn off—it is brightly lit all day and all night, which makes it very difficult to sleep. *Id.* J.B.H. does not remember the last time he got anything close to a full night's sleep, and he is constantly exhausted. *Id.*

39.    There is a hard cement slab with space for a thin mattress on the side wall of J.B.H.'s cell. *See id.* J.B.H.'s cell has a combined toilet and sink. *Id.*

40.    J.B.H. has limited access to mental healthcare at MDH and requires additional and adequate treatment, which is currently unavailable to him. *Id.* at ¶ 17. The facility has a social worker from an outside entity who visits approximately 2 or 3 times a week. *Id.* J.B.H. is currently so mentally anguished that staff has placed him on "suicide watch." *Id.* J.B.H. told staff at the Center that he had suicidal thoughts. *Id.* When children are on suicide watch staff remove their sheets from their eds for safety reasons, and replace normal food utensils with rubber ones for fear that youth might use them to cut themselves. *Id.* at ¶ 18. The staff will also sometimes strip children on suicide watch of their clothing and replace it with what is known as the "turtle suit"—a green fabric smock secured with Velcro designed to prevent self-harm. *Id.*

41.    For a child in J.B.H.'s situation—who is on SGS restriction and suicide watch— the availability of mental health services is severely limited, despite the critical need due to the child's confinement status and acute mental health crisis. As of his conversation with counsel shortly before filing, J.B.H. only received brief counseling sessions of 15 minutes or less with the

social worker when she visited his pod – but these visits happen when J.B.H. is surrounded by other children within earshot, which makes private and confidential communication impossible. *Id.* at ¶ 19.

42.     There is no additional mental health treatment available to J.B.H. beyond the periodic short visits from the outside social worker. *See id.* The extended solitary confinement has made J.B.H.'s mental health crisis much worse, and he does not understand how a facility could think it is a good idea to punish kids on suicide watch with more solitary confinement. *Id.* at ¶ 17.

43.     J.B.H. has not attended full-time school at MDH. *Id.* at ¶ 21. Since being placed on SGS he has stopped attending school at all, not even for passive reading or completing written packets. *Id*

44.     Even before his SGS restriction, J.B.H. never set foot in the facility's single classroom during his most recent stay, or his previous stay. *Id.* The only "schooling" J.B.H. received during his most recent stay was the opportunity to complete pre-assembled document packets while sitting in the facility's shared dayroom space. *Id.* This was done for 30-45 minutes each school day with no live instruction or even supervision from the facility's one teacher. *Id.* J.B.H. described the packets as "third-grade work" that did not challenge him at all. *Id.* Worse yet, during his stays at the facility J.B.H. has received the same educational packets over and over. *Id.* He has not seen them graded or marked up. *See id.* J.B.H. says there is no way to describe what he has done in MDH as "school" at all. *See id.* J.B.H. used to go to school every day in the community and enjoyed classes like science and business. *Id.* at ¶ 24. But being at MDH has set back his progress. *Id.* He is not sure if he is on track to obtain his GED. *Id.* at ¶¶ 22, 24.

45.     J.B.H. typically gets 2 personal telephone calls per week, each limited to 15 minutes. While he is on SGS restriction J.B.H. is limited to attempting phone calls during his two

thirty-minute "recreation" periods outside his cell. *Id.* at ¶ 15.

46.     J.B.H. does not have access to adequate medical care at MDH, which only has a part-time nurse, but she has not been helpful. *Id.* at ¶ 25. MDH staff routinely withhold medication he was prescribed at an IDJJ facility without explanation. *Id.* He has also been denied pain relief medication when he had a headache so severe he felt like his head was splitting open. *Id.* at ¶ 26. Because it was the weekend and the nurse was unavailable, the staff informed him that he would have to wait until she returned to the facility the following Monday. *Id.*

47.     The food portions at MDH are inadequate, often leaving J.B.H. hungry after each meal he eats in his cell. *Id.* at ¶ 27. Being on SGS restriction means receiving different and often less desirable food options than children not on SGS. *Id.* at ¶ 28. For instance, while other children were given fried chicken, J.B.H. had to eat a plain chicken patty. *Id.* On another occasion, while other children were given McDonald's, J.B.H. was not allowed to have it due to his SGS status. *Id.* J.B.H. also cannot purchase snacks from the commissary when he is hungry because of his SGS status. *Id.*

48.     J.B.H. does not believe there are enough staff at MDH to operate the facility. There are typically four or five staff on duty at a given time, with one remaining in the central "control booth." *Id.* at ¶ 29. Staff regularly complain about not having enough staff to watch the youth and say that lack of staffing is the reason kids spend so much time in their cells. *Id.*

49.     J.B.H. has received rough physical treatment from staff. A few weeks ago, he was upset about the staff's regular failure to administer his medications in a timely way, and so decided to refuse to return to his cell until staff gave him his medication. *Id.* at ¶¶ 7, 31. After the nurse refused to give J.B.H. his medication a second time, he got upset. *Id.* at ¶ 31. While in his cell, a staff member handcuffed him while he was lying face down on the floor. *Id.* The staff member

then applied pressure to J.B.H.'s back and neck area with his knee to further restrain him. *Id.* J.B.H. remained in this restraint until MDH called local sheriffs' deputies. *Id.* J.B.H. says that this is typical: police are called in when youth are shackled, and it is the police who are asked to release the youth from their physical restraints. *See id.* at ¶¶ 31-32. J.B.H. has seen staff call local police to come to the facility on multiple occasions when there are behavioral incidents and not enough staff to deal with them. *Id.*

50.     J.B.H. has been subjected to a facility-wide strip search while at the facility. *Id.* at ¶ 33. During his second stay, staff pulled each youth out of his cell into the hallway and ordered them to strip naked. *Id.* Some youth were stripped in the hallway, while others were stripped in their cells, including J.B.H. *Id.* The staff did not explain to J.B.H. why they were mass strip searching or what they were looking for. *Id.* When staff got to J.B.H.'s cell, there were 3 staff members conducting the search. They ordered J.B.H. to strip completely naked, turn around, bend over, and cough. *Id.* J.B.H. found this strip search humiliating and traumatic, and felt particularly violated. *Id.*

51.     J.B.H.'s experience at MDH has taken a serious toll on him. *Id.* at ¶ 35. The persistent confinement, feelings of loneliness and isolation are significantly impacting his well-being and mental health. *Id.* He constantly feels like he is going crazy. *Id.* He feels like nobody at the facility understands what he is going through, and when he tries to talk to the staff about it, they do not listen. *Id.* In the facility, he experiences feelings of isolation, depression, anger, and helplessness. These emotions weigh heavily on him. *Id.*

52.     J.B.H.'s experiences at MDH have had a profound impact on his transition back into the community after release. *Id.* At home, he finds himself wanting to stay in his room and be quiet because he still feels the lingering effects of confinement and isolation. *Id.* Even in the

familiar surroundings of his home, the trauma of his time at MDH persists, making it difficult for him to fully integrate back into everyday life. *Id.*

53.     J.B.H. observed that the other youth at MDH spend the vast majority of time in their cells, they are all liable to get punished with additional confinement in the form of SGS restriction or "behavior plans," they are all subject to strip searches, none of them receive adequate education, and they all face violence at the hands of staff. *See id.* at ¶¶ 5, 8, 11, 19, 21, 30, 32, 33.

54.     J.B.H. has spent time at other detention facilities as well, including Illinois Department of Juvenile Justice facilities and Focus House in Rochelle, Illinois. MDH is far worse than any of them, especially because of the time kids have to spend alone in their cells. *Id.* at ¶ 37.

55.     J.B.H. has repeatedly complained to staff about the conditions in the facility and never received any response or remediation. *Id.* at ¶ 36. He feels that the voices and needs of the children at the facility are routinely overlooked and dismissed. *See id.*

**B.     N.J.'s Experience at MDH**

56.     N.J. is a 17-year-old boy from Rock Island, Illinois who has been detained multiple times at MDH over the past three years, with a total incarceration time of nearly a year and a half. N.J. was detained around September 2022, again in November 2022, and was most recently detained between April 2023 and April 2024. N.J. was housed mostly in the Lower West wing during his most recent incarceration at the facility, often by himself and separated from other youth. He has spent time in all the wings of the facility. *See* Declaration of N.J. ("N.J. Decl."), attached hereto as Exhibit 2. N.J, at ¶¶ 1-3, 6. MDH transferred N.J. out of MDH and into another pretrial juvenile detention facility in late April 2024 shortly after he met with counsel.

57.     N.J.'s cell at MDH was very small, with a hard cement slab against one wall with a thin mattress next to a combined toilet and sink. *Id.* at ¶ 3. During his last stay at MDH he did

not have a pillow, despite requesting one from staff. *Id.* at ¶ 5. He had a sheet and one thin blanket. *Id.* It was cold at night. *Id.* There were bright fluorescent lights on the ceiling of N.J.'s cell that were always turned on, even at night when he was trying to sleep. *Id.* at ¶ 4. The constant bright light made it hard for N.J. to fall asleep, especially combined with a restless and panicked state of mind brought about by prolonged isolation. *Id.* at ¶¶ 3-5.

58.     N.J. spent virtually all his time at MDH confined by himself within the four walls of his cell. *Id.* at ¶ 6. He spent about 20 to 23 hours per day in his cell, though usually toward the higher end of that range. *Id.*.

59.     During the last several weeks of his most recent incarceration at the facility N.J. was on SGS restriction, which was imposed on him as punishment after he "talked back" to staff and refused to return to his room. *Id.* at ¶ 9. Specifically, N.J. argued with a staff member who insisted that he serve a 15-minute disciplinary "time out" alone in his room instead of in the common area of the facility. *Id.* N.J. felt that the staff member disregarded the rules of the facility by forcing him into his room for a time out, and he valued the very limited time he got to spend outside his room during the day, so he refused to return to his room. *Id.* Staff members physically restrained N.J., forced him into his room, and placed him on SGS status, where he remained for several weeks until he was transferred. *Id.*.

60.     While on SGS restriction N.J. spent around 23 hours a day in his cell. *Id.* at ¶ 6. He ate three meals a day in his cell by himself. *Id.* at ¶ 7. He was only allowed out of his cell for seven-minute showers daily, and (sometimes) about 30 minutes of total "recreation" time, which was spent a few feet away from his cell in a hallway between the cells. *Id.* Even this time was spent by himself. *Id.* He was not allowed outside during his short recreation time, or even allowed to go to the shared living area of the facility to interact with other kids. *Id.* He was not allowed to talk to

other youth while in his cell—most of the time there were no other youth to talk to because he was isolated in the wing by himself, as staff moved other youth cells away from his so that N.J. could not talk to them through the cell walls. *Id.* at ¶ 10. His only human interaction was typically with staff who would come by for "checks," but did not talk much, and when they did would sometimes tease and provoke him causing further stress. *Id.* at ¶¶ 10-12.

61.     In N.J.'s experience youth are placed on SGS restriction for refusal to follow staff direction, or for trying to advocate for themselves, such as when he protested the in-cell "time out." *Id.* at ¶ 8. Staff never told N.J. how long he could expect to remain on SGS restriction, which made the isolation even harder to endure. *Id.* N.J. explained that staff members sometimes perform an "evaluation" on Wednesdays to review youth SGS status. *Id.* If staff members decided to allow a youth to leave SGS status the youth could return to a "normal" routine; if they decided otherwise, the SGS restriction would be extended. N.J. observed that the same group of staff members who determined initial punishments got to decide how long the punishments continued, so he felt like he had no way out once certain staff supervisors decided they did not like him. *Id.* Even when his punishments were ended N.J. felt that staff would return him to restriction for the tiniest infractions, like loud talking or joking around. *Id.* During his last period of incarceration staff members eventually told N.J. that he would stay on SGS as long as he remained at the facility (and he did until he was transferred). *Id.*

62.     During his most recent stay at MDH, N.J. was placed on SGS restriction four times. *Id.* at ¶ 9. The first time was for approximately one month, soon after he arrived at the facility. *Id.* The second time was for four months between September and December of 2023. *Id.* The third time was for two weeks in December 2023. *Id.* The final time was from March 2024 until he was transferred to another facility. *Id.* All in all, N.J. spent over six months in 23-hour-a-day solitary

confinement in a single stay at MDH. *See id.*

63.     Being alone all the time and not talking to people had a significant impact on N.J.'s mental health. *Id.* at ¶ 11. He reflected that this kind of isolation "really kills a person on the inside." *Id.* He felt really bored and restless, and it was like time would move so slowly. *Id.* He believes it is inhumane and made him feel like he had been classified as "inhuman." *Id.* N.J. observed that after a while solitary confinement makes you "feel like you are not there, and like you are not valued by the world." *Id.* He would try to pass the time by reading books, but sometimes the staff would not give him any, or they only gave him books he had already read a dozen times. *Id.* at ¶ 13. It was frustrating and made the isolation even worse. *Id.*

64.     The other kind of punitive isolation N.J. experienced was called "Behavioral Hold" or a "Behavioral Plan." *Id.* at ¶ 14. When he first arrived at the facility Behavioral Plans involved more or less permanent isolation like SGS. *Id.* However, after the facility was audited by IDJJ the staff placed some additional structure into the Behavioral Plan punishment, requiring youth on a plan to attend counseling groups and completing "thinking" worksheets to reflect on the offense they had committed to be placed on the plan. *Id.* at ¶ 15. Depending on staffing levels and the preferences of staff on duty, youth were sometimes allowed to complete their paperwork in the area outside their cell or in the shared living area. *Id.* But this did not always happen—sometimes N.J. had to complete his Behavioral Plan paperwork in his cell. *Id.* Even after these changes N.J.'s experience was that youth on Behavioral Plans were confined to their rooms for more than 20 hours per day. *Id.* at ¶¶ 14-15.

65.     Behavioral Hold is imposed on youth at the whim of staff. N.J. has seen youth placed on Behavioral Hold for talking back to staff, talking to a cell neighbor without authorization, passing gas, or swearing. *Id.* at ¶ 16. The length of time youth spend on Behavioral

Hold is unpredictable and variable, ranging from one day to multiple days. Staff rarely explain the reason for your hold—sometimes they notify you of your Behavioral Hold by simply slapping a paper notice on your door informing you that you are on hold, but without providing explanation as to why. N.J. was placed on so many Behavioral Holds at MDH that he lost count. *Id.* at ¶¶ 17-20. He felt that between the different forms of punitive confinement he was essentially always in solitary confinement during his most recent stay at MDH. *Id.*

66.    The facility used to use the "Harvest Wing" as a place for long-term solitary confinement, which the kids called "seg." *Id.* at ¶ 22. Kids who were sent there would stay for weeks, sometimes months. *Id.* During a previous stay at the facility, N.J. remembers a 14-year-old girl being placed in the Harvest Wing. *Id.* He observed that she had serious and obvious mental health issues, and would scream constantly from the Harvest Wing. *Id.* Staff attempted to drown out her screams by running a loud fan, but it didn't really work, and her constant screaming put the other youth in the facility on edge. *Id.*

67.    N.J. never attended school full-time while he was at MDH. *Id.* at ¶ 24. At no point did he have regular classes or face-to-face instruction with the one teacher at MDH. *Id.* at ¶ 25. He never used the classroom at the facility. *Id.* The schoolwork he did was just worksheets that he completed by himself in the area outside his cell. *Id.* at ¶ 26. The worksheets were never returned to him graded, and he did not get feedback from the teacher on his work. *Id.* The work was far too easy to be educationally valuable to him, especially the reading assignments. *Id.* During his final weeks at the facility he did not do any schoolwork at all. *Id.* at ¶ 24.

68.    N.J. described strip searches as a common occurrence at MDH. *Id.* at ¶ 30. They were imposed both individually and as part of facility-wide strip searches. *Id.* at ¶¶ 30-31, 34. In the year-and-a-half he spent at MDH, N.J. was subjected to at least five facility-wide strip searches.

*Id.* at ¶ 34.

69.     In around December 2023 a writing pen went missing, so the staff conducted a facility-wide strip search. Staff went room to room conducting the searches. *Id.* at ¶ 30. Two staff members came to N.J.'s room and made him take off all his clothes, including his boxers. *Id.* The staff members told him to lift his genitals and do jumping jacks. *Id.* He refused and tried to cover himself up because he felt very uncomfortable with the invasive process. *Id.* The staff members then left him fully naked in the cell for 30 minutes until he complied. *Id.* He felt like he had no other choice, so he eventually did the jumping jacks. *Id.* The staff members made clear that if he did not go along with the search, they would use force on him and put him on a more restricted status. *Id.* This search really bothered N.J., and the humiliation of it has stuck with him for a long time. *Id.* at ¶¶ 30-31, 34.

70.     N.J. recalls another facility-wide strip search in around February 2024 that was conducted in the same way. *Id.* at ¶ 32. When kids would refuse strip searches the staff would get very rough with them. N.J. recalls seeing that when one youth initially refused to be strip searched, he was physically restrained by guards who cut his clothing from his body with a knife, and he was strip searched involuntarily. *Id.* at ¶¶ 32-33. N.J. found it very difficult and upsetting to watch. *Id.*

71.     N.J. described the staff as "rough" with the kids. *Id.* at ¶ 35. During his time at MDH, N.J. saw many staff restrain kids by throwing them to the ground, using chokeholds, using riot shields, and ganging up on kids. *Id.* He had a staff member attempt to knock him unconscious by placing him in a chokehold and applying pressure to N.J.'s temple. *Id.*

72.     N.J. was routinely denied access to needed medical care while at MDH. In late 2023 N.J. became extremely ill and was throwing up constantly, including vomiting blood. He had lost

weight and could not keep any food down. He told many staff members about this, and all they asked him to do was "show them the blood" that he was vomiting, and if he had already flushed it down the toilet, they did nothing to help him. Even when he showed them blood, they did not get him medical attention. It took staff seven days to get N.J. any medical attention, when they eventually sent him to the hospital to be examined. *Id.* at ¶ 36.

73.     During his last few months at the facility N.J. had terrible toothaches but was not allowed to see a dentist. On at least one occasion he had an appointment that was taken away from him as a punishment. He never did get to see a dentist before he was transferred. *Id.* at ¶ 37.

74.     While he was locked up N.J. had suicidal thoughts often and cut himself on his chest and arms frequently. The staff knew about this and did nothing to help him, focusing instead on searching his room frequently to find the implement he was using to harm himself. *Id.* at ¶ 39.

75.     N.J. was placed on suicide watch while at MDH, though from what he could tell the only accommodation differentiating suicide watch from punitive solitary confinement was the use of rubber eating utensils inside his cell instead of plastic. He had the option to visit with a facility counselor who came to MDH a few times per week but did not find the visits helpful. *Id.* at ¶¶ 38-39.

76.     N.J.'s detention at MDH has had a significant negative impact on his mental health. He felt frustrated, restless, and lonely at MDH due to the prolonged isolation and absence of human interaction. It brought out the worst in him. He felt that staff were constantly provoking him, then punishing him when he acted out, like a vicious cycle. He felt it was like a game to them to see how much he could take. *Id.* at ¶¶ 4, 11-12, 42.

77.     N.J. complained about all these issues to staff many times at the facility. He has received no meaningful response or remediation. *Id.* at ¶ 41.

### C.    M.P.'s Experience at MDH

78.    M.P. is a 15-year-old boy who was detained at MDH for about a year between April 2023 and April 2024. He was 14 when he was first detained. The facility transferred M.P. to an Illinois Department of Justice facility after he met with counsel. *See* Declaration of M.P. ("M.P. Decl."), attached hereto as Exhibit 3, at ¶¶ 1-3.

79.    Like J.B.H. and N.J., M.P. was not comfortable in the small concrete cell where he spent most of his time at MDH. *Id.* at ¶¶ 5-6. He had difficulty sleeping because of the fluorescent lights that were left on for twenty-four hours per day. *Id.* at ¶ 6.

80.    M.P. spent at least nineteen hours per day in his cell while he was detained at MDH—during "normal" times. *Id.* at ¶ 7. He was often in solitary confinement when he was placed on Behavioral Hold. *Id.* at ¶¶ 7-8.

81.    M.P. was placed on Behavioral Hold at least twenty times while detained at MDH. *Id.* at ¶ 10. During the week he met with counsel M.P. had recently been on Behavioral Hold for three straight days for "talking back" to a staff member. *Id.* When he was on Behavioral Hold, M.P. estimated spending at least twenty-two hours per day in his room. *Id.* at ¶ 8. The time he spent outside his room was spent filling out his Behavioral Plan paperwork and participating in groups in his living area. M.P. said there were multiple kids on Behavioral Plan at any given time. *Id.* at ¶¶ 8, 10.

82.    M.P. observed that when he first arrived at the facility the constant isolation that was his daily reality "really got to [him.]" *Id.* at ¶ 14. He became restless and tried to pass the time as best he could by reading, but the time felt endless. *Id.* M.P. explained that when you spend that much time in your room by yourself you get more and more angry, and then a hopelessness sets in. It is just too much time to pass. *Id.*

83.    M.P. regularly observed other youth placed in more restrictive solitary confinement called SGS, which M.P. describes as constant solitary confinement. *Id.* at ¶ 11. Kids on SGS restriction basically don't leave their cells at all, they are "just isolated." *Id.* There were typically multiple kids on SGS restriction at any given time. *Id.* Some kids never seemed to leave this total isolation, and staff treated them poorly, and like they were afraid of them. *Id.*

84.    When he first arrived at the facility M.P. saw staff put kids in isolation in a separate wing of MDH called the "Harvest Wing." *Id.* at ¶ 12. Soon after arriving at the facility M.P. saw a youth placed in a headlock or submission hold and dragged into the Harvest Wing, and he did not see him again for some time. *Id.* The staff stopped using the Harvest Wing as a segregation unit around June of last year—according to staff members they did this to get around a rule against using segregation units. *Id.* M.P. observed that all the staff really did, however, was move segregation unit into the youths' normal living space. *Id.*

85.    M.P. did not attend anything that could be described as "school." *Id.* at ¶ 16. When he was not on Behavioral Hold, he might complete worksheets for an hour or two in the dayroom outside his cell. *Id.* The one teacher at the facility did not provide live instruction or give him feedback on his work. *Id.* M.P. did well in school outside the facility and was frustrated at MDH because the work he received there did not challenge him at all. He felt it was at a sixth-grade level at most. *Id.*

86.    In or around September 2023, MDH performed a facility-wide strip search because a writing pen had gone missing at the facility. *Id.* at ¶ 18. Staff at MDH pulled each living unit into the gym, then forced the children into an empty cell one at a time for strip searches. *Id.* When they pushed M.P. into the cell the guards forced him to take off all his clothes, including his boxers. *Id.* at ¶ 19. They made him lift his genitals and do jumping jacks. They also made him squat and

cough. *Id.* M.P. did not want to strip, but knew staff would force him to do it anyway so he did not feel he had any choice. *Id.*

87.    M.P.'s other experiences show that he was correct to assume that staff would forcibly strip search him if he refused. *Id.* at ¶ 20. In or around December 2023 M.P. was strip searched involuntarily, again over a missing writing pen. *Id.* MDH staff brought him into an empty cell in Lower West, where he backed up against a wall and begged staff not to strip search him. *Id.* A staff member threw M.P. down onto the cement slab bed on his stomach and pulled his legs up behind his back, twisting him into a painful position. *Id.* While that staff member was restraining him, another guard cut M.P.'s clothes and boxers off his body with a knife. *Id.* After stripping him of his clothes and forcibly searching his body, the guards left M.P. naked in the empty cell until another guard finally gave him boxers to partially cover himself. *Id.* The whole search was extremely humiliating for M.P., and being left to sit naked by himself compounded the harm. *Id.*

88.    M.P. states that staff members are frequently aggressive and rough with kids at MDH, throwing them to the ground, using riot shields in cells, grabbing and tackling kids, and using headlocks. *Id.* at ¶ 22.

89.    M.P. complained about all the issues above many times while at MDH and there was never any attempt to address his concerns. *Id.* at ¶ 24.

*          *          *

90.    J.B.H., N.J., and M.P.'s experiences at MDH are not unique. They are typical of the conditions faced by all children currently detained at MDH.

91.    Solitary confinement is a way of life at MDH. Children at the facility are routinely subjected to punitive solitary confinement at the whim of staff, whether it is classified as "SGS"

or "Behavioral Hold". Even when they are not subject to enhanced punishment youth spend around twenty hours per day in their room. Many of the precious few minutes of so-called "free time" children receive outside their cells is not meaningfully different from their solitary confinement, as they spend it seated in an attached hallway only a few feet away from their cells.

92.    The youth spend their confinement in essentially identical concrete cells the size of a parking space, and have fluorescent overhead lights that never turn off, making sleep difficult to impossible. Youth are all served meals that state auditors have deemed insufficient, and that leave them hungry even after they eat. Many youth eat their meager meals alone in their cells. Some youth in enhanced confinement have their food downgraded as part of their punishment.

93.    Children at the facility—many of whom have significant mental health issues even before their incarceration—do not have access to adequate mental health services to cope with the compounding mental health traumas inflicted by their isolation and harsh physical treatment at MDH. The facility has no mental health professional on-staff. While an outside social worker visits MDH a few times a week to talk to youth (often in a non-private setting), there is no enhanced mental health intervention for children in mental health crisis, including children who are in such acute crisis that the facility has placed them on "suicide watch."

94.    Children at MDH are routinely subjected to humiliating, invasive, and traumatic strip searches. Many of these searches are conducted indiscriminately across the facility, without any individualized suspicion.

95.    Children at MDH are routinely subjected to violence at the hands of staff, who impose harsh physical restraints on youth for relatively minor infractions.

96.    The facility does not provide any of the children in their custody with adequate education, replacing meaningful full-day schooling with self-guided worksheets, and sometimes

no "schoolwork" at all.

## II.    The Inhumane Conditions at MDH are Well-Known to Defendants

97.    MDH's inhumane conditions are well known in the surrounding area and in the juvenile detention community writ large. The facility's problems are not new, they have been the subject of public scrutiny for some time, and they are well-known to Defendants.

98.    In February 2022, the Illinois Department of Juvenile Justice ("IDJJ") conducted an audit of MDH and found it non-compliant in many key areas, with many significant problems "requiring immediate attention." *See* IDJJ Knox County Audit Report 2022 ("2022 Report"), attached hereto as Exhibit 4.

99.    In accordance with 730 ILCS 5/3-15-2(a) and (b) of the Illinois Compiled Statutes, IDJJ is statutorily responsible for establishing minimum standards for juvenile detention centers throughout the state. IDJJ also inspects all county detention centers on a yearly basis to ensure compliance with these standards.

100.    Among other serious operational failures it identified, IDJJ's 2022 Report highlighted the facility's use of extended child confinement, which it characterized as a "significant violation of several County Detention Standards." *Id.* at 7. At the time of the Department's walk-through, "most youth at the facility were confined in their rooms." *Id.* at 4. According to IDJJ, the "the utilization of confinement as a response to negative behavior at the facility is a significant concern and must be addressed urgently." *Id.* at 6. IDJJ observed that youth "are confined for eight to 32 hours for a single infraction." *Id.* It further observed that multiple youth were placed in "seg," with one youth having endured segregation for approximately six weeks, and the other for about two months. *Id.* IDJJ noted that youth in segregation had the water to their cells turned off for extended periods of time. *Id.* at 7. Youth in segregated confinement did

not attend school at all, or even complete educational packets in their rooms. *Id.* One youth "had trouble communicating when she was last out of her room." *Id.* at p. 6-7.

101.    IDJJ's 2022 Report also highlighted the facility's deficiencies in medical and mental health care. It pointed out that although the facility has a part-time nurse it lacks a physician on staff, and there is no existing contract for a physician to provide services. *Id.* at 8-9. Similarly, the facility has no mental health professionals on staff; instead, it relies on a separate, outside entity called Bridgeway to provide a counselor to visit the facility for youth in crisis. *Id.* at 9. The Report concluded that "[i]t is clear that the volume of mental health services available to youth at Mary Davis Home is insufficient to meet minimum standards, much less best practice." *Id.*

102.    The 2022 Report criticized the education children received at MDH. It underscored that although there is a single teacher on-site, that is insufficient educational staffing for the youth population at the facility. *Id.* at 12. Additionally, the current educator is not a licensed special education teacher, meaning youth with Individualized Education Plans ("IEPs") or other specialized education needs are not receiving necessary services. *Id.* The 2022 Report also pointed out that youth were not receiving an adequate number of hours of education per day, and those on confinement or segregation status were not receiving educational services at all. *Id.*

103.    The 2022 Report also highlighted that MDH restricts certain youth from eating in the dietary area, instead requiring them to eat all their meals in their cells. *Id.* at 11-12. The food provided to youth subjected to this punishment differed or was of lesser quantity than the meals provided in the dietary. *Id.*

104.    The 2022 Report also noted that strip searches were routine enough at MDH to be incorporated into the ordinary intake procedures at the facility. IDJJ therefore recommended that MDH "eliminate the use of strip searches as a standard process during intake." *Id.* at 4. Instead,

strip searches could only be administered "where there is an individualized, reasonable suspicion." *Id.* at 1.

105.    IDJJ performed a follow-up audit of the facility in June 2022. MDH was the only facility that IDJJ deemed necessary to revisit immediately. Unfortunately, the audit revealed no meaningful improvement in many of the areas previously identified. *See* Knox County Juvenile Detention Center—Interim Inspection Report, attached hereto as Exhibit 5.

106.    Despite the 2022 Report's public warning, MDH continued subjecting youth to solitary confinement throughout 2022. The follow-up report highlighted multiple instances where youth were still subjected to confinement as punishment; for example, one youth received confinement as punishment for having too many magazines in his cell. At least two youth were still in segregated solitary confinement in the so-called Harvest Wing while the IDJJ auditor visited the facility. IDJJ concluded that there had "been little improvement on the February findings in this area" and that Mary Davis Home "remains significantly out of compliance . . . and should take immediate action to come into compliance." *Id.* at 2.

107.    The facility continued to post failing grades in education as well: it still only had one insufficiently qualified teacher available, and youth continued replacing real classroom time with passive work on packets in the dayroom area. The facility remained out of compliance with this standard. *Id.* at 3.

108.    By the time of the 2022 follow-up audit, the facility still had not contracted with a qualified mental health practitioner as IDJJ required. *Id.* at 3.

109.    The Department audited the facility for a third time in April 2023. *See* IDJJ Knox County Audit Report 2023 ("2023 Report"), attached hereto as Exhibit 6. The 2023 Report found that the facility was still using solitary confinement—this time over a year after the first audit

report, and after two public warnings about the practice. The Department inspector observed

frequent use of confinement even while he was physically present to conduct the IDJJ audit. The

2023 Report highlighted that MDH regularly rotates youth "in and out of confinement throughout

the day with no behavioral justification." *Id.* at 4-5. The 2023 Report observed that MDH re-

branded its punitive confinement practice with the term "Behavior Hold," but the practice still

involved confining youth to their cells for 24 hours or more. *Id.* at 5. The 2023 Report highlighted

one instance where a youth had been placed on a behavioral hold the day before the inspection and

remained on hold during the inspection. *Id.* This youth's parental visit was cancelled as part of this

punishment in violation of detention standards. *Id.* There were still two youth segregated in the

Harvest Wing at the time of the audit. *Id.*

110.    The 2023 Report also highlighted issues with the use of physical restraint at the

facility. *Id.* at 6. The auditor reviewed recent video footage of one restraint incident at MDH and

deemed it necessary to report it to the Department of Children and Family Services. *Id.*

Additionally, it was noted that the staff member involved in the restraint incident had not received

proper restraint training. *Id.*

111.    The 2023 Report acknowledged that the facility had hired a part-time physician,

but MDH still failed to meet standards for providing adequate mental health care. *Id.* at 6-7. The

2023 Report observed that the facility had arranged for an outside social worker to visit twice a

week for a total of seven hours of weekly services, but her role primarily involved assessing day-

to-day needs. *Id.* at 7. Due to limited hours, the social worker had not conducted assessments on

all youth at the facility. *Id.* Additionally, the social worker did not have a formal caseload and did

not develop treatment plans. *Id.*

112.    At the time of the 2023 audit the facility still had only one general education teacher

28

and no special education teacher at all. *Id.* at 8. The 2023 Report noted that MDH's lone teacher was not even licensed to teach high school, being licensed only for grades K-9. *Id.* The 2023 Report observed that the facility continued to make insufficient use of the classroom and relied on packets instead of instruction. *Id.*

113.   The Administrative Office of Illinois Courts ("AOIC"), which has established its own policies and procedures for juvenile detention centers, also conducts site visits and audits to ensure compliance with its standards. In July 2022 the AOIC audited MDH and found that the facility failed to meet the criteria in all nine areas audited (Introduction, Administration, Admissions, Programming, Medical and Mental Health Services, Release Planning, Documentation, Resident Rights), receiving a "Does Not Meet" rating in every category. *See* AOIC Summary of the Juvenile Detention Review: Mary Davis Home 2022, attached hereto as Exhibit 7.

114.   A third state agency, the Illinois State Board of Education ("ISBE"), conducted an audit of MDH in May 2023 to review its nutrition program and meal compliance. *See* ISBE School Nutrition Programs Meal Compliance and Accountability Report 2023, attached hereto as Exhibit 8. In its final report, ISBE noted that "due to the severity of the problems identified, County of Knox [MDH] will receive a follow-up review." *Id.* The report highlighted several critical issues, including inadequate portion sizes in meal services, food safety and storage problems, and deficiencies in food documentation. *See id.*

## III.   The Conditions at MDH Are a Direct Result of Policies, Customs, and Practices Defendants Developed

115.   MDH's culture of solitary confinement, unmitigated by mental health resources or meaningful educational opportunity, has developed as a consistent and deliberate policy, custom, and practice over an extended period of time under the leadership of Defendants Cavanaugh, Steck,

and Pletz, who are responsible for overseeing the day-to-day operation of the facility, and under the oversight of Knox County, which is the final policymaking authority for the Center and exercises hiring authority and oversight over the other Defendants with respect to its functioning. Defendants have subjected children to these conditions with no legitimate penological government purpose, and in the face of public condemnation of the facility's practices.

116. The unconstitutional conditions experienced by children in MDH are also a direct result of a policy of inadequate staffing and deprivation of key resources that has been established by the Knox County Board and overseen and implemented by Defendants Cavanaugh, Steck, and Pletz. Knox County has a statutory duty to "support[] and maintain" a juvenile detention center, including paying for the costs of "its establishment and maintenance" and for "supplies or repairs necessary to maintain, operate and conduct . . . the detention home" and detention services. *See* 55 ILCS 75/1(a); 55 ILCS 75/3(a)-(d); 55 ILCS 75/9.3. It has failed to do so.

## IV. The Conditions and Culture of Solitary Confinement Maintained at MDH are Profoundly Harmful

### A. Extended Solitary Confinement is Harmful for Children

117. An extensive body of research on solitary confinement establishes that the practice results in serious and wide-ranging negative effects on incarcerated individuals. Children are particularly vulnerable to the harmful effects of confinement due to their ongoing physical, psychological, social, and neurological development. As a result, there is a widespread clinical consensus that solitary confinement is inappropriate for children. *See* Declaration of Louis Kraus, M.D. ("Kraus Decl."), attached hereto as Exhibit 9.

118. Children who have a history of trauma, mental illness, or developmental disabilities are particularly vulnerable to the harms caused by solitary confinement. *Id.* at ¶¶ 19, 24. Most children who are detained or incarcerated for any length of time fall into one or more of these

categories. *Id.*

119.    Children in solitary confinement face a significant risk of serious psychological and emotional harm. *Id.* at ¶¶ 15-16, 18. Solitary confinement negatively impacts children by perpetuating or worsening existing mental health problems, or precipitating new ones. *Id.* at ¶ 20. This can lead to a range of psychological symptoms, including but not limited to, anxiety, depression, difficulty maintaining attention, impaired concentration, memory problems, disorientation, heightened sensitivity, feelings of paranoia and psychosis, engaging in self-harm, and an increased risk of suicide. *See id.* at ¶¶ 26-27.

120.    The effects of solitary confinement manifest in physical symptoms, including gastrointestinal problems, insomnia, deterioration of eyesight, chronic fatigue, weakness, sensitivity to cold temperatures, heart palpitations, recurring migraine headaches, joint pains, loss of appetite, weight loss, and exacerbation of pre-existing medical conditions. *See id.* at ¶ 28.

121.    Solitary confinement deprives children of social interaction, educational opportunities, and environmental stimulation during critical developmental stages. Children subjected to this practice see their cognitive growth and overall brain development severely impaired. *See id.* ¶ 20.

122.    Because it necessarily deprives them of educational opportunities, extended solitary confinement also deprives children of the intellectual stimulation needed for their cognitive development. *See id.* at ¶ 30; *see also* Sandra Simkins, Marty Beyer, and Lisa Geis, *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 WASH. U.J.L. & POL'Y 241, 257-61 (2012); *see also Report of the Attorney General's National Task Force on Children Exposed to Violence*, U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention (December 2012), https://www.justice.gov/defendingchildhood/cev-rpt-

full.pdf.

123.    Suicide rates and incidents of self-harm are much higher for detainees in solitary confinement. *See id.* ¶¶ 22-23*; see also* ACLU Briefing Paper, *The Dangerous Overuse of Solitary Confinement in the United States* (2014), https://www.aclu.org/sites/default/files/assets/stop_solitary_briefing_paper_updated_august_2014.pdf. A national study by the U.S. Department of Justice Office of Juvenile Justice and Prevention found that half of youth who committed suicide in juvenile facilities were in isolation at the time of their death and more than 60% percent of young people who committed suicide in detention had a history of being held in isolation. *Id.* ¶ 22; Lindsay Hayes, *Juvenile Suicide in Confinement: A National Survey*, U.S. Department of Justice Office of Justice Programs (February 2009), https://www.ojp.gov/pdffiles1/ojjdp/213691.pdf. Among children held in detention centers, 40% of suicides occurred within the initial 72 hours of confinement. Kraus Decl. at ¶ 22. Thus, even short periods of solitary confinement pose a serious risk of harm that can be fatal for children. *Id.*.

124.    Children subjected to solitary confinement have an increased chance of recidivism, or reoffending. *Id.* at ¶ 28; Council of Juvenile Correctional Administrators, *CJCA Toolkit: Reducing the Use of Isolation* (March 2015), https://stopsolitaryforkids.org/wp-content/uploads/2016/04/CJCA-Toolkit-Reducing-the-use-of-Isolation.pdf. Isolation and a lack of rehabilitative programming can make successful reintegration into society more difficult. *See id.* at ¶ 25, 30. Additionally, the psychological trauma caused by solitary confinement can lead to feelings of alienation from society and resentment, reducing defined children's ability to reintegrate into their communities and making it more difficult for them to find stability. *See id.* at ¶ 17-18, 20, 25.

125.    The negative effects of solitary confinement can extend beyond the immediate

period of isolation. Children may continue to experience the negative effects of solitary confinement even after their release from custody. *Id.* at ¶ 24.

126.    The overwhelming body of research demonstrating youth solitary confinement's profound harms has led to a widespread legal and institutional consensus that the practice has no proper place in juvenile detention. In December 2012, a task force appointed by the U.S. Department of Justice's Attorney General issued a report that read in part, "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement." *Report of the Attorney General's National Task Force on Children Exposed to Violence*, U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention (December 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf. And in 2016, based on the Department's recommendation, the use of solitary confinement against children was banned in all federal prisons. *Department of Justice Review of Solitary Confinement*, The White House Office of the Press Secretary (January 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

127.    Other authorities such as the American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care have recognized that solitary confinement is harmful for children and have opposed the use of solitary confinement on children. Kraus Decl. at ¶ 28.

128.    International and human rights organizations have also criticized the use of solitary confinement. The World Health Organization ("WHO"), the United Nations, and other international bodies have recognized that solitary confinement is particularly harmful to a child's psychological well-being and cognitive development. The United Nations Standard Minimum Rules for the Treatment of Prisoners, revised in 2015 as the Nelson Mandela Rules, completely

prohibit solitary confinement for children. *Resolution adopted by the General Assembly on 17 December 2015*, United Nations General Assembly (January 2016), https://documents-dds-ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf?OpenElement. The United Nation's Special Rapporteur on Torture has repeatedly condemned the use of solitary confinement on children *for any duration*, calling it "cruel, inhuman or degrading treatment or punishment or even torture." *Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, United Nations General Assembly (2015), file:///C:/Users/apicard/Downloads/A_HRC_28_68_Add.1-EN.pdf.

129.    In Illinois's youth prison system solitary confinement has been effectively banned for some time. On May 4, 2014, as part of a lawsuit filed in 2012 by the ACLU of Illinois, IDJJ instituted a policy banning use of the practice in its now five state-run juvenile facilities. *R.J. v. Mueller*, No. 12 C 7289 (N.D. Ill. Sept. 2012); *see also* Julie Bosman, *Lawsuit Leads to New Limits on Solitary Confinement at Juvenile Prisons in Illinois*, The New York Times (2015), https://www.nytimes.com/2015/05/05/us/politics/lawsuit-leads-to-new-limits-on-solitary-confinement-at-juvenile-prisons-in-illinois.html. In addition, Illinois House Bill 3140 ("End Youth Solitary Confinement Act"), which prohibits all youth solitary confinement—including in juvenile detention facilities—was recently passed by both the Illinois House and Senate in early May.

130.    Many other states in recent years have banned or placed restrictions on the use of solitary confinement for children as well. *See, e.g.*, Amy Fettig, *2019 was a Watershed Year in the Movement to Stop Solitary Confinement*, ACLU National Prison Project (December 2019); *see also State Laws or Rules that Limit or Prohibit Solitary Confinement of Juveniles*, National Conference of State Legislatures (January 2021), https://www.documentcloud.org/documents/

21203238-state-laws-that-limit-or-prohibit-solitary-confinement-2020.

**B.    Defendants Confine Children in Physical Conditions That Create a Psychologically Abusive Environment**

131.    MDH compounds the harm caused by its use of solitary confinement with the conditions of the cells themselves.

132.    Fluorescent overhead lights in children's cells stay on 24 hours a day. Sleeping in a constantly illuminated environment has been shown to be extremely harmful. Indeed, it is a recognized method of torture. *Solitary Confinement Facts*, American Friends Service Committee, https://afsc.org/solitary-confinement-facts; *see also Torture in United States Prisons: Evidence of Human Rights Violations*, American Friends Service Committee, https://afsc.org/sites/default/ files/documents/torture_in_us_prisons.pdf.

133.    MDH further disrupts children's sleep by denying them pillows and adequate blankets.

134.    When they are occasionally allowed to leave their cells, children are still prevented from contacting other children, even those locked up in cells only a few feet away. They are also subjected to invasive strip searches and other traumatic and physically abusive encounters with staff and sometimes with law enforcement officers, who are frequently called in to supplement the staff on site at MDH.

135.    In addition, children are frequently left hungry, with inadequate food that lacks the necessary calories and nutrients to meet basic nutritional standards. Youth in punitive confinement have their already inadequate food rations downgraded as part of their punishment.

136.    All of these conditions reinforce one another to form a toxic, abusive, and unconstitutional environment no child should be made to endure.

137.    The frequent use of unreasonable, invasive, and traumatic strip searches further

compounds the harm of solitary confinement. The trauma from these kinds of incidents has a pronounced traumatic effect on the developing brains of adolescents. *See* Kraus Decl. at ¶ 30.

**C.    Withholding Mental Healthcare from Youth Subjected to Extended Solitary Confinement is Harmful**

138.    The culture and policy of solitary confinement maintained at MDH imposes harms that are amplified by Defendants' cruel failure to provide the affected children with mental health services necessary to cope with the trauma of their surroundings.

139.    A large percentage of children in detention have diagnosed and undiagnosed mental health needs, or histories of trauma and abuse, or both. *See* Kraus Decl. at ¶¶ 19-20. A national study found that 75% to 93% of children entering the juvenile justice system are estimated to have experienced some degree of trauma. Samantha Buckingham, *Trauma Informed Juvenile Justice*, 53 Am. Crim. L. Rev. 641, 654 (2016).

140.    Additionally, studies show that 65-75% of children in juvenile custody have a diagnosable mental health disorder, with 20% of these children exhibiting a severe mental health disorder. *See* Skowyra, Kathleen, and Cocozza, Joseph., *A Blueprint for Change: Improving the System Response to Youth with Mental Health Needs Involved with the Juvenile Justice System*, The National Center for Mental Health and Juvenile Justice Policy Research Associates, Inc. (January 2007). MDH's practice of solitary confinement exacerbates these mental health problems while causing new ones. *See* Kraus Decl. at ¶ 20.

141.    Withholding mental healthcare from youth subjected to solitary confinement— even those on suicide watch or otherwise acute mental health crisis—exacerbates the practice's physical and psychological harms and inflicts new ones. *See* Kraus Decl. at ¶ 23.

### D.    Withholding Education from Youth Subjected to Extended Solitary Confinement is Harmful

142.    Defendants' failure to provide the children in their care a meaningful education further compounds the harm of their solitary confinement.

143.    It is well-established that education in correctional facilities reduces recidivism rates. Davis, Lois M., Robert Bozick, Jennifer L. Steele, Jessica Saunders, and Jeremy N. V. Miles, *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs That Provide Education to Incarcerated Adults*, RAND Corporation (2013), https://www.rand.org/pubs/research_reports/RR266.html. Defendants have failed to ensure that all children detained at MDH have access to meaningful and comprehensive educational services.

144.    Children at the facility are formally enrolled at the local Galesburg, Illinois school district. The Regional Office of Education employs one primary teacher, but none of the children at MDH are receiving full-time educational services.

145.    As IDJJ's Reports noted, the children at MDH do not consistently attend school in a classroom. Their experience with "schooling" was often the completion of self-guided worksheets. There is no qualified and licensed special education teacher on staff, and no special education services provided to children with Individualized Education Plans. There is no full-day school for any of the youth at MDH, and youth in punitive solitary confinement are denied access to schoolwork altogether. School is constantly canceled or denied as punishment throughout the facility, or in response to even slight disruptions or time conflicts.

146.    Children incarcerated at MDH are at crucial points in their educational development. Outside incarceration, cancellation of a single day of school causes these youths' school districts to mobilize and plan to make up every lost hour at the end of the year. Yet when they enter MDH, their educational needs are simply ignored, sometimes for weeks or months. They

are thus deprived of education as punishment, and denied the education provided to other children their age in Illinois.

147.    As a proximate result of the Defendants' repeated failures to provide an adequate education to children in their custody, the children in MDH suffer compounding physical and psychological harm from their confinement, and are falling behind in their academic development.

## CLASS ALLEGATIONS

148.    Plaintiff J.B.H. brings this action on his own behalf and on behalf of others similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

149.    The putative Plaintiff Class includes all children who are currently, or in the future will be, detained in MDH (the "Putative Class").

150.    The "Putative Class" consists of children detained pretrial and awaiting release or transfer to their permanent detention facility, which constitutes an inherently transitory population. While there is uncertainty as to how long any one plaintiff will remain at MDH, there will be a constant class of youth suffering the constitutional violations alleged in this Complaint as long as MDH remains in operation.

151.    If discovery or further investigation reveals that the Putative Class should be expanded or otherwise modified, the named Plaintiff reserves his right to amend the Class definition or propose subclasses as necessary.

152.    The Plaintiff Putative Class satisfies the requirements of Rule 23(a) in that:

153.    *Numerosity*: The Putative Class is so numerous that joinder of all members is impracticable. MDH detains hundreds of children annually. According to the most recent available data, MDH had 199 admissions in 2023.[1] There has been similarly significant facility turnover in

---

[1] *JMIS Monthly Data Report*, ILLINOIS JUVENILE JUSTICE COMMISSION (2023), https://ijjc.illinois.gov/wp-content/uploads/2024/02/JMIS-Monthly-Data-Report-December.pdf.

2023. Due to financial and legal capacity constraints, most of these children cannot file individual lawsuits.

154.    *Commonality*: There are questions of law and fact common to the Putative Class. These include, but are not limited to:

(a)    Whether the conditions at MDH pose substantial risks of serious harm to Plaintiff and the Class?

(b)    Whether the State Defendants knew or should have known of these risks?

(c)    Whether the County's long-standing "policy or custom" of understaffing the Center caused harmful and injurious conditions at MDH?

(d)    Whether Defendants' policy or practice of unreasonable strip searches caused harmful and injurious conditions at MDH?

155.    *Typicality*: The named Plaintiff's claims are typical of those of the Putative Class. The named Plaintiff is detained at MDH and has been subjected to the Defendants' challenged policies, practices, and procedures (or lack thereof); therefore, his claims arise from the same conduct and are based on the same legal theory as the class claims.

156.    *Adequacy*: The named Plaintiff is capable of fairly and adequately protecting the interests of the Putative Class and will diligently serve as a class representative. The named Plaintiff does not have any antagonistic interests to the Putative Class and seeks injunctive relief on a class-wide basis to remedy class injuries and enjoin the Defendants' unlawful conduct. Furthermore, the named Plaintiff and the Putative Class are represented by competent counsel with significant experience in civil rights litigation, detainee and prisoners' rights litigation (including over a decade of experience in the youth detention context in Illinois), and complex class action litigation.

157.    This action is maintainable as a class action pursuant to Rule 23(b)(1) because the prosecution of separate actions by individual children would create a risk of inconsistent and

varying adjudications, which in turn, would establish incompatible standards of conduct for MDH.

158.    This action is also maintainable as a class action pursuant to Rule 23(b)(2) because Defendants have acted, or failed to act, on grounds generally applicable to the Class as a whole, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the Class.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
### Violation of the Eighth and Fourteenth Amendments
### (Asserted by Named Plaintiff and Putative Class Against Defendants Chief Judge Raymond Cavanaugh, Bridget Pletz , and Wendi Steck)

159.    The preceding paragraphs are incorporated as if fully set forth herein.

160.    Defendants maintain a policy, custom, and practice of excessively confining children at MDH, and of employing solitary confinement as enhanced punishment through Behavioral Plans and Special Group Status restrictions. Defendants know that prolonged solitary confinement has serious psychological consequences for anyone, but especially for children. This practice lacks any legitimate penological or governmental purpose and is grossly inconsistent with established clinical and legal consensus, which recognizes that youth solitary confinement is profoundly harmful. Yet Defendants persist with these policies and practices that place children at serious risk of harm.

161.    Defendants compound the harm of solitary confinement by forcing children to spend their days in physical conditions that combine with the trauma of solitary confinement to create a toxic and psychologically abusive environment.

162.    Defendants' failure to provide adequate mental healthcare to children in its custody likewise compounds and causes harm. Defendants know that the youth in their custody often have serious mental health conditions when they enter MDH, and being detained—separated from

families, caregivers, and social supports—can cause additional trauma and mental anguish for children.

163.    Despite this knowledge, Defendants do not provide adequate mental health treatment and instead subject youth to additional punishment, even withholding mental health treatment for those youth who are most isolated and most in need of urgent treatment to stabilize mental health symptoms, such as those youth who are placed on SGS status, suicide watch, or both. The facility also fails to adequately train and supervise staff to respond in appropriate ways to children with mental health needs.

164.    Defendants further compound the harm to children detained at MDH by denying them any meaningful education at critical points in their academic development.

165.    Children at MDH thus endure a constellation of abuses and deprivations while detained there, locked in extended solitary confinement in cells with substandard conditions and without enough food, all while denied basic mental healthcare and the intellectual stimulation that comes from age-appropriate schooling. These practices—each harmful in isolation—mutually reinforce and amplify one another to create an environment of acute psychological abuse and expose children to a substantial risk of serious harm at MDH.

166.    Defendants have been repeatedly informed of the harm caused by their actions to children detained at MDH, as well as the severe damage inflicted upon children in their care due to the conditions at MDH. Despite this awareness, Defendants are deliberately indifferent to the harm and risks of harm these practices cause to children at MDH, and have consistently acted with deliberate indifference by applying the same harmful policies and practices and failing to make any changes to improve the conditions at MDH.

167.    Plaintiff and members of the Putative Class have Eighth Amendment rights that

include, but are not limited to: the right to be free from and protected from physical, psychological, and emotional harm; the right to necessary treatment, care, and services; the right not to deteriorate physically, psychologically, or emotionally while in custody; and the right to be free from substantial risks of the above-mentioned harms.

168.    The conditions described in this Complaint violate the Eighth and Fourteenth Amendment rights of the children detained at MDH.

169.    Defendants have continuously violated the law, as detailed in this Complaint. As a proximate result of Defendants' actions, the named Plaintiff, as well as the Putative Class he represents, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries; they likewise face a substantial risk of serious injuries from Defendants' persistent and ongoing violations of the law.

170.    These injuries will continue unless enjoined by this Court.

### COUNT II – 42 U.S.C. § 1983
### Municipal Liability
### (Asserted by Named Plaintiff and Putative Class Against Defendant Knox County)

171.    The preceding paragraphs are incorporated as if fully set forth herein.

172.    Defendant Knox County, acting through the Knox County Board, is the final policymaking authority for MDH. It is responsible for overseeing MDH's operation and supervising and conferring with its leadership, funding MDH's operations, as well as hiring staff and contracting for support services that shape the day-to-day lives of the children at MDH.

173.    Knox County implemented and oversaw the policy, custom, and practice of children being subjected to solitary confinement in substandard conditions without access to mental healthcare or a meaningful education.

174.    The County has also overseen and participated in a pattern and practice of

constitutional violations so widespread as to constitute a custom, policy, or practice with the force of law.

175.   Defendant Knox County reasonably knew that its failure adequately to staff the facility would result in children being subjected to a harmful mental health environment, while confined to their cells and without access to critical services like education and medical and mental health care.

176.   Defendant Knox County was also made aware that its policies, practices, and customs caused the unconstitutional conditions described in this Complaint, and of the attendant harm they caused the children of MDH.

177.   Defendant Knox County's policies, practices, and procedures proximately caused the harm described in this Complaint.

178.   Defendant Knox County acted with deliberate indifference in developing, overseeing, and implementing those policies, customs, and practices.

179.   Defendant Knox County's actions are not only objectively unreasonable, but also show a deliberate disregard for the consequences.

180.   Defendant Knox County has continued to violate the Constitution, and the named Plaintiff, as well as the Putative Class he represents, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries and risks of injuries as a result.

181.   These injuries will continue unless enjoined by this Court.

**COUNT III – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendments**
**(Asserted by Named Plaintiff and Putative Class Against Defendants Chief Judge**
**Raymond Cavanaugh, Bridget Pletz, and Wendi Steck)**

182.   The preceding paragraphs are incorporated as if fully set forth herein.

183.   Defendants maintain a policy or practice of conducting frequent and unreasonable

strip searches of the children confined at MDH, in violation of the Fourth and Fourteenth Amendments.

184. These searches are overly broad in scope, as they are often conducted as mass strip searches of all youth in the facility, without any individualized suspicion or reasonably articulable security interest.

185. The searches are highly and disproportionately invasive. Strip searching is an unreasonable method of searching children absent evidence of an imminent risk of harm.

186. Strip searches are humiliating, demeaning, and traumatizing for anyone, but especially for children being strip searched by adults who are strangers to them. When youth refuse or resist the strip search, staff use physical force to obtain compliance. The strip searches, and the force used against those children who resist, frequently take place in front of the other children, adding to the privacy violation.

187. The unreasonableness of these mass strip searches is also demonstrated by the fact that they violate IDJJ's regulations, which permit a strip search of a youth to be administered "only when there is individualized, reasonable suspicion." 20 Ill. Adm. Code 2602.50(f); *see also* 730 ILCS 5/3-15-2 (authorizing IDJJ to promulgate minimum standards for the conditions of juvenile detention facilities and "for the treatment of juveniles with respect to their health and safety and the security of the community").

188. Defendants have continuously violated federal law, as detailed in this Complaint. As a proximate result of Defendants' actions, the named Plaintiff, as well as the Putative Class he represents, have endured and continue to suffer serious and irreparable physical, psychological, and emotional injuries, and have been and continue to be subject to substantial risk of continued harm.

189.    These injuries will continue unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff J.B.H., on behalf of himself and all others similarly situated, respectfully request that the Court enter the following relief:

a.    Declare this suit is maintainable as a class action pursuant to Rules 23(a), 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure;

b.    Adjudge and declare pursuant to Rule 57 of the Federal Rules of Civil Procedure that the conditions of confinement at MDH, as well as the Defendants' policies, practices, acts, and omissions complained of herein, violate the rights of the named Plaintiff and the Putative Class he represents under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment.

c.    Permanently enjoin Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

d.    Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm described herein;

e.    Award named Plaintiff and the Class attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

f.    Grant such other and further relief and this Court deems just and proper.

DATED: May 28, 2024

Respectfully submitted,

/s/ Kevin M. Fee

Camille E. Bennett
Kevin M. Fee
Samantha Reed
Alexis Picard
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
cbennett@aclu-il.org
kfee@aclu-il.org
sreed@aclu-il.org
apicard@aclu-il.org