## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| J.B.H., by his next friend Debra Medlock, A.M., by his next friend Rachael Puig, and J.L.S., by his next friend Tremay Parrow, on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>KNOX COUNTY, CHIEF JUDGE RAYMOND A. CAVANAUGH of the Ninth Judicial Circuit Court, BRIDGET E. PLETZ, Director of Court Services of the Ninth Judicial Circuit Court, and WENDI L. STECK, Superintendent of the Mary Davis Home,<br><br>　　　　　　Defendants. | Case No. 24-cv-04096-CRL<br><br>Hon. Judge Colleen Lawless |

### SUPPLEMENTAL PLEADING

Plaintiffs, on behalf of themselves and all others similarly situated, bring this supplemental complaint and allege as follows:

1.　　J.L.S. is a 17-year-old boy who has been incarcerated in the Mary Davis Home since April 18, 2023. Plaintiff J.L.S. is identified by his initials in accordance with Federal Rule of Civil Procedure 5.2 because he is a minor at the time of this action. He appears in this action through his next friend, Tremay Parrow. J.L.S. sues on his own behalf and on behalf of the putative class.

2.　　While incarcerated at MDH Plaintiff J.L.S. has been subject to the same unconstitutional conditions, policies, and practices challenged in the First Amended Complaint, which this pleading supplements and incorporates by reference. J.L.S was subjected to extensive use of solitary confinement, saying children are "stuck in [their] rooms for so long, and the staff

1

4:24-cv-04096-CRL    #79-1   Filed 04/28/25   Page 3 of 5

still treat kids unfairly and with a lot of violence." *See* Declaration of J.L.S. ("J.L.S. Decl."), attached hereto as Exhibit A-1, at ¶ 2 (also attached to Plaintiffs' Combined Reply and Supplemental Evidentiary Memorandum in Support of Motion for Preliminary Injunction, attached as Exhibit 10 to Dkt. 70 (filed under seal at Dkt. 69-41)). He describes how "Special Group Status" or "SGS" has meant 23-and-1 confinement during his time at MDH. *Id.* at ¶ 3.

3.   In the two years he has spent at MDH, J.L.S. has been placed on SGS at least 10 times, sometimes for weeks, or even a month at a time. *Id.* at ¶ 5. He describes how staff can put kids on SGS for "lots of reasons," including messing around in the gym or just for cussing. *Id.* at ¶ 7. J.L.S. has been placed on SGS several times in 2025, including as recently as April 2025.

4.   He also describes how MDH staff can extend a child's SGS for "pretty much anything." *Id.* at ¶ 9.

5.   J.L.S. explains how, during his stay at MDH, children on SGS usually get one hour out of their cell, but that sometimes out-of-cell time is reduced to as little as 20 or 30 minutes. *Id.* at ¶ 10. When J.L.S. was on SGS in November 2024, he only got one hour out of his cell, ate every meal in his room, and "[d]id school in the wing for 30 minutes" before having to go back to his cell. *Id.* at ¶ 11. J.L.S. describes how the use of extensive and punitive solitary confinement "made [him] feel so alone." *Id.* at ¶ 14.

6.   He describes how isolation is the norm at MDH. *See id.* This isolation has deeply affected J.L.S.; he now feels "quiet around people" and is "not so used to talking anymore." *Id.* The solitary confinement has made him, and other kids, antisocial and reclusive. *Id.*

7.   Beyond solitary confinement, J.L.S. describes other harmful conditions at MDH. He describes how the so-called education provided at MDH is "not appropriate or helpful" for him.

*Id.* at ¶ 15. According to J.L.S., Defendants repeat the same lessons, and the lessons are not tailored to a child's actual grade level. *See id.*

8.  J.L.S. is currently trying to earn his GED, but at MDH he's "basically on [his] own" as no one at MDH, not even the teacher, helps him with his GED work. *See id.*

9.  J.L.S. also explains that access to mental health is limited, especially for children on punitive confinement, like SGS. *Id.* at ¶ 17-18. And if any outside mental health professional does speak with children on SGS, it is usually through their cell door for just a few minutes. *Id.* This was J.L.S.'s experience during his November 2024 SGS. *Id.* at ¶ 18. Like other youth who have described this, J.L.S. does not feel comfortable talking about mental health issues through a cell door where there is clearly no privacy. *Id.*

10. J.L.S. also describes being strip searched repeatedly during his two years at MDH. *Id.* at ¶ 20. He describes the experience as "uncomfortable," because "when they search you, you have to be completely naked, turn around, squat, and cough." *Id.*

11. In the final paragraph of his declaration, J.L.S. describes that "MDH wants us to be like robots." *Id.* at ¶ 24. "They don't want us to be who we really are, and it's like I can't even be myself here." *Id.* He also describes the punitive environment and conditions, where "there are so many rules, and if you mess up even a little you get punished." *Id.*

WHEREFORE, Plaintiffs request that the Court permit filing of this supplemental complaint and permit J.L.S. to join this case as a plaintiff.


DATED: April 25, 2025              Respectfully submitted,

                                   /s/ *Kevin M. Fee*

                                   Kevin M. Fee
                                   Camille E. Bennett

3

4:24-cv-04096-CRL    # 78-1    Filed: 04/28/25    Page 5 of 5

Samantha Reed
Alexis Picard
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 201-9760
cbennett@aclu-il.org
kfee@aclu-il.org
sreed@aclu-il.org
apicard@aclu-il.org


Timothy R. Farrell
Catherine E. Conroy
Ropes & Gray LLP
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Tel: (312) 845-1209
Fax: (312) 845-5569
timothy.farrell@ropesgray.com
catherine.conroy@ropesgray.com

E-FILED
Friday, 25 April, 2025  06:33:03 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| J.B.H., by his next friend Debra Medlock, and A.M., by his next friend Rachael Puig, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KNOX COUNTY, CHIEF JUDGE RAYMOND A. CAVANAUGH of the Ninth Judicial Circuit Court, BRIDGET E. PLETZ, Director of Court Services of the Ninth Judicial Circuit Court, and WENDI L. STECK, Superintendent of the Mary Davis Home,<br><br>Defendants. | Case No. 24-CV-04096-JES-JEH<br><br>Hon. James E. Shadid |

### DECLARATION OF J.L.S. III

I, J███ L. S███ III, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am 17 years old, and I am currently detained at the Mary Davis Home. This is the first time I have been detained here. Before that, I had been detained at a JDC in Iowa for a month.

2. I've been at MDH for a really long time—probably the longest of any kid here ever. I've been here almost 2 years now. I've seen a lot of stuff go down at MDH, and honestly, nothing serious has changed. We're still stuck in our rooms for so long, and the staff still treat kids unfairly and with a lot of violence. It's like nothing gets better. This place needs a lot of changes, but no one's actually doing anything to make it better. It feels like they don't care about us or our well-being. If they did, they'd actually listen and make real changes, but it's the same old stuff.

3. MDH is all about room confinement. We're basically always stuck in our rooms. When they lock us in as punishment, they call it Special Group Status, or SGS. When I first got

here, SGS was 23-1, and honestly, nothing has really changed—it's still basically the same.

4. If you do get more time out of your cell on SGS, it depends on the staff.

5. I've been on SGS so many times at Mary Davis Home, at least 10 times. Once, about a year ago, I was on SGS for at least a month. I have no idea why I was on SGS for that long. I thought I was doing everything right and behaving. A friend of mine was on SGS for like three months once.

6. More recently, I was on SGS for about two weeks around November 2024 and sometime in late January and February of this year. Nobody gets put on SGS for just a day—it's usually about a week on average.

7. Staff can put kids on SGS for lots of reasons. For example, if you hang on the hoop in the gym, you can be put on SGS, or even just for cussing. One time, they weren't letting my friend out of his room, so I would go and hang on the hoop in protest. That's something kids do a lot when they feel like they're being treated unfairly. Some kids just get bored and act out and end up on SGS.

8. One kid was on SGS for three months straight—they basically set him up for failure. He has ADHD and needs to be doing something all the time. He loses his mind if he's in his cell alone. So even if he was doing good and was let off SGS, he would act up as soon as he got out of his room or went for a shower, because he was feeling so pent up. This same friend is on SGS right now, and he's been stuck on it for like 2-3 weeks. Staff keep saying he's misbehaving just to keep him on SGS, but he's not even doing anything wrong. One time, they extended his SGS just because he was cussing while talking to me.

9. And staff can extend your SGS for pretty much anything. Now, we get this paper that's supposed to tell us what we need to do to get off SGS—like get a certain amount of points,

write a letter, or counseling sessions or thinking reports, or groups stuff like that. But honestly, staff will find any excuse to keep you on SGS longer. It doesn't even matter if you're following the rules—they'll just make up a reason to extend it.

10. When kids are on SGS, we only come out of our rooms for one hour a day at most—30 minutes in the morning and 30 minutes on second shift. But you're lucky if you actually get the whole hour. It depends on the staff if kids get more time out. Sometimes, staff only let kids on SGS out of their cell for one half hour in a day. When I was on SGS in December 2023, I barely got any time out, like maybe 20 minutes the whole day for multiple days. This was normal. Kids would be lucky if you got the full hour out for SGS rec.

11. When I was on SGS in November 2024, I only got 1 hour out of my cell for the whole day for the whole time I was on SGS. I ate every meal in my room. Did school in the wing for 30 minutes, back in the cell. The same thing happens on second shift, but instead of school you just get like 30 minutes, maybe an hour, for rec. You don't come out with everyone else usually—you're just by yourself in the wing.

12. During my last SGS around February of this year, I was pretty much stuck in my cell or my wing's dayroom the whole time. The wing dayroom is basically right next to our cells. It's just a little space with a table and some chairs, and all you can really do is sit there and watch TV. It's not much different from just being locked in your room. I didn't get to go to the Living Area or dietary or the gym all that much. All I could really do was watch TV. My friend was on SGS with me, and he got so frustrated from being locked up for so long that he kicked the wing door out of frustration. Staff extended his SGS time for that. I also got my SGS extended because a staff member banged my friend's head into the wall, and I felt like I had to protect my friend, so I got into it with staff. They extended my SGS too.

4:24-cv-04096-CRL    # 79-2   Filed: 04/28/25   Page 50 of 69

13.     And that 30 minutes a day for rec is the only time you have to shower and make phone calls to family. You don't get to play the Xbox on SGS, and you can only watch the same movies TV. You usually can't even play basketball in the gym.

14.     Being on SGS made me feel so alone. The only recreation time on SGS is usually by yourself on the wing. You eat your meals alone in your room. After being on SGS a lot, I kind of got used to being alone. I got quiet around people—I'm not so used to talking anymore. All I want to do is sit in my room and read or talk to myself or I write rap lyrics. Being on SGS made me realize that some staff just don't care about me or my health. It also makes kids real antisocial, and even when we do get out for rec when we're not on SGS, nobody feels like talking much. It affects all of us.

15.     The education here is not appropriate or helpful to me. My first year at MDH, I went through an entire year of school here, and I didn't get any credits whatsoever. I know that because I asked, and the Assistant Superintendent told me I wasn't getting credits. The next year, they tried to put me in school again but they were just teaching the same things over again. All the lessons are the same, and nothing changes depending on what grade you're in. I told them I needed something different to do, but they don't have any programming here to help kids get their GED. My criminal lawyer helped me get into a GED program, so that's what I do now. But even with my GED program, I'm basically on my own. Nobody on staff really helps me, and it's super stressful. I feel like I can't ask anyone for help because the staff don't know the answers or how to help me. The teacher at MDH doesn't help me either.

16.     And when I refuse to go to MDH's school because they're just repeating the same lessons and I'm not actually learning, I get punished and put on Tier 3. It's a lose-lose situation. Tier 3 is a disciplinary level where you don't have as many privileges, and you barely get time out

of your room. Most of the kids at MDH are on Tier 3 right now. It's super easy to lose points and end up there, like if you accidentally drop something or sit somewhere you're not supposed to. Staff just say we're being disruptive and drop our points. Staff always make up new rules, and it's hard to remember all the rules.

17. When I'm not on SGS, I talk to the mental health professional, Ms. Callie, all the time when she's here. If we're lucky, she comes in two times per week, and I can talk to her for 30 to 40 minutes in the nurse's office. But when you're on SGS, the staff usually won't let me go to the nurse's office to talk to Ms. Callie—at most, she might come talk to you at your cell door at the end of her shift for a minute or two, just to make sure you don't feel like killing yourself. But it isn't private, so you can't really talk about things and other kids can hear.

18. This happened to me in November 2024 when I was on SGS. I asked the staff to let me talk to Ms. Callie but they wouldn't let me out of my room to talk to her. She came to talk to me on the wing, but just for a minute. I didn't feel comfortable talking to her when everyone on the wing could hear. And sometimes, the mental health people would forget to come see me. I really want to talk to Ms. Callie when I'm on SGS, as it would be really helpful.

19. MDH also has something called behavior plans, or BP. When you get put on a behavior plan, you have to stay on it for at least 48 hours and usually longer. During that time, you have to do a group and a counseling session, and you have to complete a "thinking report" within 48 hours. Any staff can put kids on a BP, but a supervisor has to approve kids getting off BP. Kids are on behavior plans all the time—they're really common. We can't go a week without at least one kid on a BP at MDH. When you're on a behavior plan, you're stuck on Tier 3 no matter how good you have been. You still go to school in the classroom, but you get fewer privileges and an earlier bedtime. I think I've been on BP about 100 times in the last two years. Most recently, I was

on behavior hold just last week because another client gave me my letter from them. The other kid also got put on a BH for this. When you get on SGS, you're automatically on a BP.

20. I've been searched at least 50 times at MDH, easily. It's ridiculous. It's such an uncomfortable process having grown adults search you like that. I feel bad for the kids going through it for the first time. Basically, when they search you, you have to be completely naked, turn around, squat, and cough. They check everything. I was just searched a few weeks ago. A supervisor thought me and a couple other kids were under the influence, but we weren't. They searched all three of us in separate rooms. I had to undress completely, turn around, squat, and cough. Staff didn't find anything on me, and then I got put on a BP.

21. Staff are really violent with kids at MDH, especially when it comes to restraints. My friend's been slammed on his head multiple times by staff. They're violent with me too. I've got this big mark on my shoulder from when staff slammed you to the ground in my wing and it scraped. This happened just a month ago. It hurt for days after, and I didn't see the nurse or anything. On the same day during this same restraint, another staff member put his hands around my neck, like he was trying to choke me. He did this because I was getting loose from another staff member's restraint, and he tried to hold me down by basically choking me. I started yelling for help and told him I couldn't breathe.

22. Staff don't really explain what we can even grieve. They don't tell us our rights or anything like that. There's nowhere in the facility where we can see what our rights are, or how to grieve.

23. There are a lot of issues at MDH, and the grievance process doesn't really work here. I don't really write grievances because it feels like a joke. I've seen so many kids write grievances, and nothing ever changes. I've even heard staff talk about throwing them away.

24. The lawyers have talked to me about the lawsuit they filed against MDH, and how they're trying to make it a class action to help all the kids here. That's what I want to do—help other kids so they don't have to go through the same stuff I've been through. MDH wants us to be like robots. They don't want us to be who we really are, and it's like I can't even be myself here. I'm on Tier 1 right now, and to get there, I basically had to act like a robot. There are so many rules, and if you mess up even a little, you get punished. It's all about control, and they don't care if you're struggling or frustrated. We don't matter to the staff.

4:24-cv-04096-CRL  # 79-2  Filed: 04/28/25  Page 49 of 69

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _11_ day of March 2025.   Respectfully submitted,

