## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

|  |  |  |
|---|---|---|
| J.B.H., by his next friend Debra Medlock, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 24-4096 |
| KNOX COUNTY, *et al.*, | ) ) | |
| Defendants. | ) | |

## <u>ORDER</u>

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Plaintiffs' Second Amended Motion for Class Certification (Doc. 88) and Plaintiffs' Motion for Preliminary Injunction (Doc. 33). For the reasons stated below, Plaintiffs' Motions are GRANTED.

## I.    BACKGROUND

Plaintiffs, on behalf of themselves and others similarly situated, filed a Class Action Complaint under 42 U.S.C. § 1983 against Defendants Knox County, Raymond A. Cavanaugh (Chief Judge of the Ninth Judicial Circuit Court), Bridget E. Pletz (Director of Court Services of the Ninth Judicial Circuit Court), and Wendi L. Steck (Superintendent of the Mary Davis Home) alleging violations of their Fourth, Eighth, and Fourteenth Amendment rights while they were detained at the Mary Davis Home ("MDH") in Galesburg, Illinois. (Docs. 1, 9, 79).

Plaintiffs allege MDH subjects minor detainees to solitary confinement for excessive periods of time and deprives them of basic needs, such as education, mental health services, sleep, and human contact. MDH's solitary confinement practices allegedly exacerbate detainees' preexisting mental health conditions and lead to self-harm and attempted suicide. MDH allegedly fails to provide adequate mental health care for detainees in solitary confinement, which is especially harmful to detainees with mental health conditions and on suicide watch. Plaintiffs also bring a *Monell* claim against Defendant Knox County and seek declaratory and injunctive relief on behalf of themselves and the Class, including an order compelling Defendants to develop and implement a plan to remedy the allegedly unconstitutional conditions at MDH.

On October 10, 2024, Plaintiffs filed a Motion for Preliminary Injunction and supporting Memorandum requesting entry of an order preliminarily enjoining Defendants from placing detainees at MDH in solitary confinement, except as a time-limited response to imminent threats of harm. (Docs. 33, 35). On October 24, 2024, the U.S. Department of Justice filed a Statement of Interest on behalf of the United States in support of Plaintiffs' Motion. (Doc. 38). On February 14, 2025, Defendants filed Responses in opposition to Plaintiffs' Motion. (Docs. 52, 55). On April 11, 2025, Plaintiffs filed a Combined Reply and Supplemental Evidentiary Memorandum. (Doc. 70). On April 17, 2025, Defendants Steck, Pletz, and Cavanaugh filed a Response to Plaintiffs' Supplemental Evidentiary Memorandum. (Doc. 73). On May 16, 2025, the Court held a video hearing and took the matter under advisement. (Minute Entry 5/16/2025).

On May 23, 2025, Plaintiffs filed their Second Amended Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) to certify a class of children who are currently, or in the future will be, detained at MDH (the "Class"). (Docs. 88, 90). Plaintiffs seek declaratory and injunctive relief on behalf of themselves and the Class, including an Order compelling Defendants to develop and implement a plan to remedy the allegedly unconstitutional conditions at MDH. *Id.* In July 2025, Defendants filed Responses in opposition to class certification. (Docs. 94, 96). Defendants Steck, Pletz, and Cavanaugh also filed motions to submit supplemental authority and an additional exhibit. (Docs. 97, 101). The Court granted the motions and has considered the additional caselaw and exhibit. Plaintiffs filed their Reply on September 5, 2025. (Doc. 103).[1]

## II.    PLAINTIFFS' SECOND AMENDED MOTION FOR CLASS CERTIFICATION

### A.  Legal Standard

Federal Rule of Civil Procedure 23 governs the certification of class actions. Rule 23(a) ensures the named plaintiffs are appropriate representatives of the class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). Under Rule 23(a), a party seeking class certification must show:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

---

[1] Federal Rule of Civil Procedure 23 directs the court to determine whether certification of a class is appropriate at "an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). "Class damages cannot be awarded if no class is certified." *Davis v. Hutchins*, 321 F.3d 641, 648 (7th Cir. 2003); *see also Wilburn v. Nelson*, 329 F.R.D. 190, 193 (N.D. Ind. 2018) (opting to certify a class of detained youth before ruling on request for injunctive relief).

    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a)(1)-(4). If each of these prerequisites are met, the court must also find that the proposed class satisfies at least one of the requirements in Rule 23(b). *Wal-Mart*, 564 U.S. at 345. Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

    "Class certification is appropriate only if, 'after a rigorous analysis,' the trial court is satisfied that the requirements of Rule 23 have been met.'" *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350); *see also Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008) (district court has broad discretion to determine whether certification is appropriate). This rigorous analysis does not extend to weighing the merits of a putative class's claims. *Wal-Mart*, 564 U.S. at 350 ("[A]t this early stage of the litigation, the merits are not on the table."). "[I]f a class plaintiff satisfies all the requirements of Rule 23(a) and Rule 23(b), the class *must* be certified, even if it is sure to fail on the merits." *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022) (emphasis in original). "Plaintiffs have the burden of demonstrating that the requirements of Rule 23 are met." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017) (citing *Wal-Mart*, 564 U.S. at 350).

### B. Analysis

Plaintiffs define the proposed class as "[a]ll children who are currently, or in the future will be, detained in the Mary Davis Home." (Doc. 90). Plaintiffs argue the Court should certify this proposed class because they satisfy the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and the requirements of Rule 23(b)(2).

#### 1. Numerosity

The Court must first consider whether the proposed class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania*, 850 F.3d at 859. "The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). "Mere speculation" and "conclusory allegations" of the class size will not support a finding that joinder is impracticable. *Arreola*, 546 F.3d at 797.

Plaintiffs argue the proposed class is comprised of numerous minors who are detained each year before trial at MDH, many for only a few days or weeks. Plaintiffs state MDH had 199 admissions in 2023 and 146 admissions in 2024. (Doc. 90 at p. 6). Plaintiffs assert the fluidity of the putative class further serves to satisfy the numerosity requirement. For instance, only 24 of the 146 admissions in 2024 stayed at the facility for more than 30 days. *Id.* at p. 7. Plaintiffs contend the inherently transitory nature of the class members makes joinder into the class impracticable.

Plaintiffs also note MDH records show 26 youth were placed on Special Group Status ("SGS"), and 86 youth were placed on a behavioral plan between January 1, 2022 and November 25, 2024. (Docs. 89-2, 89-3). Incident reports demonstrate that youth continue to be placed on SGS and behavioral plans. In January 2025, at least five detainees were placed on behavioral plans, and two were also placed on SGS. (Doc. 89-1 at pp. 2-14). In February 2025, four detainees were placed on behavioral plans, and two were also placed on SGS. *Id.* at pp. 15-28. Plaintiffs argue all detainees are subject to the same policies, which allow them to be placed on SGS or a behavioral plan at any time.

Finally, Plaintiffs argue the putative class also includes youth who will be detained at MDH in the future. Plaintiffs contend the number of minors admitted to MDH during the pendency of this lawsuit, along with future detainees who will join the transitory putative class, make joinder of all members impracticable.

Defendants argue Plaintiffs have not satisfied the numerosity requirement, as the current average daily population at MDH is well below the forty-member threshold for a class. Defendants note that according to an Illinois Department of Juvenile Justice ("IDJJ") inspection report, MDH had an average daily population of 20 detainees in 2024. *Id.*; Doc. 9-8. In its 2025 report, the IDJJ noted MDH had an average daily population of approximately a dozen detainees. (Doc. 94-2 at p. 4; Doc. 95-1). Defendants assert Plaintiffs cannot rely on future detainees because they lack standing.

Here, the Court finds joinder is impracticable due to the size of the class, the unidentifiable future members, and the inherently transitory nature of the class members. MDH's population records show that at least 149 minors have been detained at MDH

since Plaintiffs first moved to certify a putative class of "all current and future detainees" on May 28, 2024. (Doc. 104). Contrary to Defendants' assertion, courts routinely consider future detainees when determining whether the numerosity criteria is met and certify classes containing future detainees. *See Copeland v. Wabash Cnty., Ind.*, 338 F.R.D. 595, 602 (N.D. Ind. 2021) (citing *Ind. Prot. and Advocacy Servs. Comm'n v. Comm'r, Ind. Dept. of Corr.*, No. 1:08-CV-01317-RLYJMS, 2010 WL 1737821 *1 (S.D. Ind. Apr. 27, 2010) ("[B]oth the transient nature of the inmate population and the request for injunctive relief that will also inure to the benefit of future, currently unknowable, class members likewise support a finding that joinder is impracticable.")); *Olson v. Brown*, 594 F.3d 577, 583 (7th Cir. 2010) (noting that "the plaintiff must show that there will likely be a constant class of persons suffering the deprivation complained of in the complaint"). Therefore, the proposed class meets the numerosity requirement of Rule 23(a)(1).

### 2. Commonality

Second, Plaintiffs must show "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Commonality usually exists when the defendants have engaged in standardized conduct with respect to class members. *Wilburn v. Nelson*, 329 F.R.D. 190, 195 (N.D. Ind. 2018) (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)). A "drove" of common questions is not required—one "common question" is enough, if it shows "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350; *see also Orr v. Shicker*, 953 F.3d 490, 496 (7th Cir. 2020) (a single common question was enough to satisfy commonality). "The claims must depend on a common contention that is 'capable of

classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Scott v. Dart*, 99 F.4th 1076, 1088 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1166 (2025) (quoting *Wal-Mart*, 564 U.S. at 350).

Plaintiffs argue the proposed class members' claims present common questions of law or facts, as all class members are subject to the same conditions and policies at MDH. As detailed extensively in the briefing in support of their Motion for Preliminary Injunction and in detainees' declarations, Plaintiffs contend MDH routinely subjects youth to harrowing conditions which impact their physical, psychological, social, and academic developments. For instance, Plaintiffs allege MDH uses solitary confinement as punishment, locking youth in their cells for up to twenty-three hours a day to discipline them for various infractions. The cells are lit with fluorescent lights twenty-four hours a day, making it difficult for the youth to fall asleep to escape their maddening isolation. Youth are routinely forced to eat their meals alone in their cells. Much of the "free time" the youth receive outside their cells is spent just a few feet away in the dayroom—a small space at the end of the common hallway linking the cells together. *Id.*

Plaintiffs assert the use of solitary confinement as a punishment is not a rare or accidental occurrence, but rather a matter of MDH policy. According to Policy 9.7 of MDH's Policy and Procedure Manual, which was in effect from January 2024 to February 2025, youth on SGS are, by definition, removed from regular programming and are only required to be given "one hour of physical recreation and one hour of leisure time per day," without requiring that "recreation" or "leisure" must take place outside the youth's

room. (Doc. 69-7). Even the current version of Policy 9.7 continues to authorize "timeouts" and behavioral holds. (Doc. 94-11 at p. 118). Plaintiffs assert a finding that the conditions at MDH, including placement in solitary confinement, create risks of serious harm to all class members would answer a common question that would drive a resolution of this case. Other common issues include:

a) Whether the State Defendants have failed to address those conditions in a manner that was objectively unreasonable;

b) Whether the State Defendants have acted with knowledge or reckless disregard as to the substantial risk of harm caused by these conditions; and

c) Whether Defendant Knox County's long-standing "policy or custom" of understaffing the Center caused harmful and injurious conditions at MDH.

(Doc. 90 at p. 15).

Defendants argue Plaintiffs failed to establish commonality. Relying on *McFields v. Dart*, 982 F.3d 511 (7th Cir. 2020), Defendants contend commonality is not met by showing all class members suffered a violation of the same policy. (Doc. 94). As Plaintiffs note in their Reply, *McFields* was critically discussed four years later by the Seventh Circuit in *Scott v. Dart*, 99 F.4th 1076 (7th Cir. 2024). In *Scott*, the Seventh Circuit held that the district court, relying on *McFields*, abused its discretion by refusing to certify a class of jail detainees claiming inadequate dental care. This was because *McFields*, 982 F.3d at 514, dealt with an inherently individualized "paper triage" policy that turned on each class member's request for treatment—while *Scott* involved a facility-wide policy that the jail would not keep an oral surgeon on staff. The Seventh Circuit held in *Scott* that the district court had "misapplied [*McFields*] and based its decision on too strict a standard"

because class members—even in a damages class—do not need to have identical experiences to warrant the certification of a class. 99 F.4th at 1079.

Likewise, Plaintiffs were subject to facility-wide practices that posed a risk of harm to all youth incarcerated at MDH. Each class member eventually will have to present individualized evidence to show that their constitutional rights were violated. *Id.* at 1091 ("Individualized evidence may also be used to determine the amount of damages to which each class member if entitled."). The extent to which they were harmed is irrelevant at the class certification stage. *Id.* The Court finds Plaintiffs established the commonality requirement under Rule 23(a)(2) by setting forth several common issues.

### 3.  Typicality

Typicality is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021) (internal quotations and citation omitted). A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Plaintiffs argue their claims are both common and typical of the class, as demonstrated by numerous declarations from youth who experienced prolonged punitive isolation on SGS and/or behavioral holds, insufficient access to mental health care, and inadequate educational services. Defendants assert Plaintiffs' claims lack

typicality due to the atypical length of their detentions. Defendants also argue J.B.H.'s and A.M.'s claims lack typicality because their detentions at MDH ended on June 20, 2024 and July 9, 2024, respectively, when prior versions of MDH's policies were in place. Consequently, Defendants assert their claims do not "arise" from the same "practice or course of conduct" that would give rise to the claims of current or future class members. Finally, Defendants argue J.L.S.'s claims lack typicality due to his atypical and extreme behavior during his detention.

Here, Plaintiffs challenge the same MDH practices (*i.e.*, the use of solitary confinement for punishment) and will rely on the same legal theories to prove their claims. The class representatives' experiences do not materially differ from those of the other declarants or from the conditions reported in IDJJ's audit reports. They have been subjected to solitary confinement through the SGS restriction policy and the facility's new "Behavioral Hold" policy. (Doc. 94-11 at p. 118). Potential factual differences, such as the length of each detainees' confinement or which policy was in force during their detainment, are inconsequential at this stage. *See Wilburn*, 329 F.R.D. at 197 (finding typicality requirement met for class action involving use of solitary confinement of juveniles for punishment) (citing *Flood v. Dominguez*, 270 F.R.D. 413, 418 (N.D. Ind. 2010) (certifying class of pretrial detainees and finding that "just like the commonality inquiry, the typicality requirement is met because the Plaintiffs challenge the same jail practices and will rely on the same legal theories to prove their claim. This controls despite any factual distinctions that may arise.")). Rule 23(a)(3) does not "require that each member of the class suffer precisely the same injury as the named class representatives . . . ." *De*

*La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The Court finds the typicality requirement under Rule 23(b)(3) is met.

### 4. Adequacy of Representation

Adequacy is satisfied where "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Adequacy involves two inquiries: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). When determining whether representative parties will "fairly and adequately protect the interests of the class," courts look at whether a named plaintiff has "sufficient interest in the outcome of the case to ensure vigorous advocacy" and "does not have interests antagonistic to those of the class." *Morr v. Plains All Am. Pipeline, L.P.*, No. 17-CV-163-SMY, 2021 WL 4554659, at *5 (S.D. Ill. Oct. 5, 2021).

Plaintiffs argue J.B.H., A.M., and J.L.S. will fairly and adequately protect the interests of the class, as their experiences are representative of the other detainees at MDH. For example, Plaintiffs contend they were allegedly subjected to prolonged solitary confinement at MDH, did not receive appropriate mental health interventions despite their documented mental health needs, and suffered mental and emotional harm from these experiences.

Defendants argue the named Plaintiffs are inadequate class representatives because they were released from MDH. Despite their release, Plaintiffs assert J.B.H., A.M., and J.L.S. remain committed to representing the interests of their peers at MDH. The

Court finds their release is not a barrier to their representation of the class. As the Seventh Circuit held in *Olson,* individuals may represent a class of persons detained in temporary detention facilities even after they have been released or transferred if the "inherently transitory" exception applies. 594 F.3d at 581; *see Westmoreland v. Hughes*, 144 F.4th 952, 955 (7th Cir. 2025) (explaining that "otherwise moot class claims can be saved by the inherently transitory exception") (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399-400 (1980)). Several district courts have reached the same conclusion. *See, e.g., Walsh v. Kelley*, No. 17-CV-05405, 2021 WL 4459531, at *4 (N.D. Ill. Sept. 29, 2021) (granting class certification where only one of three plaintiffs named in class certification motion were still imprisoned at county detention facility at time of certification hearing); *Richardson v. Monroe Cnty. Sheriff*, No. 1:08CV0174-RLY-JMS, 2008 WL 3084766, at *5 (S.D. Ind. Aug. 4, 2008) (finding plaintiff was still adequate to represent class of persons challenging living conditions at county jail despite his release from that facility); *Austin v. Smith*, No. 15-CV-525-JDP, 2017 WL 945105, at *3 (W.D. Wis. Mar. 9, 2017) (same).

The "inherently transitory" exception applies when "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Olson*, 594 F.3d at 582. Here, because the detainees at MDH may be transferred in or out of the facility at any time, an individual detainee's length of detention cannot be determined at the outset. There will be a constant class of detainees housed at MDH. Second, the mere fact the named Plaintiffs' individual

claims for injunctive relief may be moot does not mean they do not have the ability or incentive to vigorously represent the claims of the class.

Defendants also argue the named Plaintiffs are inadequate class representatives because they failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e). Specifically, Defendants assert A.M. did not file a grievance; J.B.H. filed a grievance but did not exhaust the administrative process; and J.L.S. filed a grievance *after* filing this suit. Even if J.B.H. exhausted his administrative remedies, Defendants assert "his grievance is insufficient in specificity or scope to open the floodgates for the deluge of claims Plaintiffs wish to litigate class-wide." (Doc. 94 at p. 18).

The PLRA requires an inmate to fully exhaust his administrative remedies before filing a lawsuit pursuant to § 1983. *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 2009). The exhaustion requirement applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

As Defendants note, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Bowers v. Dart*, 1 F.4th 513, 517 (7th Cir. 2021) (quoting *Jones v. Bock*, 549 U.S. 199, 211 (2007)). In *Jones*, the Supreme Court recognized that "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id.* at 216. Based on the allegations in their

Amended Complaint and Supplemental Pleading, Plaintiffs adequately alleged Defendants violated their constitutional rights. (Docs. 9, 79). While the parties may disagree about the precise list of specific claims that were exhausted, "the class certification stage is not the place to resolve the merits of a particular defense and thus the Court believes that the exhaustion issue is better left for summary judgment." *See Copeland*, 338 F.R.D. at 606 (declining to rule on the issue of exhaustion at class certification stage). The Court will defer its decision on Defendants' exhaustion arguments at this time.

Finally, Defendants argue J.L.S., who was detained at MDH after the facility implemented policy changes in February 2025, is an inadequate class representative because "his uncommon and atypically long detention are replete with idiosyncrasies." (Doc. 94 at p. 19). Defendants describe his behavior at MDH in detail. *Id.* at pp. 19-21. Defendants also contend J.L.S. cannot represent the class in claims challenging MDH's use of forced room confinement because he "declined programming" multiple times. For example, he declined programming "at least 23 times" in May 2025 and "at least 3 times" in June 2025 before he was transferred to another facility. *Id.* at p. 19. Plaintiffs assert J.L.S.'s programming decisions do not make him an inadequate class representative, as J.L.S. explains why he declined programming in his declaration. (Doc. 69-41 at ¶¶ 14-16). The Court finds J.L.S.'s behavior and programming decisions do not make him an inadequate class representative, as he experienced solitary confinement and allegedly suffered due to MDH's failure to provide appropriate mental health treatment. Even

assuming *arguendo* that J.L.S. is an inadequate class representative, certification of the class does not hinge on his ability to represent the class.

The Court finds Plaintiffs J.B.H., A.M., and J.L.S. are adequate representatives of the class. There is no evidence of their inadequacy or that they have any unique defenses or circumstances that might cause conflict between them and the other members of the proposed class. Plaintiffs understand the basic facts underlying their claims, most notably the conditions they allegedly experienced while in solitary confinement. Although not contested by Defendants, the Court recognizes Kevin Fee, Camille Bennett, Samantha Reed, Alexis Picard, Timothy Farrell, and Catherine Conroy are more than adequate to serve as class counsel. Plaintiffs have satisfied Rule 23(a)(4).

### 5.  Rule 23(b) Requirement

In addition to meeting the class certification requirements under Rule 23(a), Plaintiffs' proposed class must also satisfy one of the requirements under subsection (b). Plaintiffs only seek certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360.

Here, final injunctive relief or corresponding declaratory relief, if ultimately granted, would be appropriate respecting the class as a whole. Liability will be based on

a common question for all the proposed class members. The resolution of each class member's claims will hinge on the same operative facts relative to Defendants' standardized conduct. The Court finds that class certification is appropriate under Rule 23(b)(2).

### 6. Plaintiffs' Claims Against Defendant Knox County

In its Response to Plaintiffs' Second Amended Motion for Class Certification, Defendant Knox County largely adopts the State Defendants' arguments as to the class certification analysis. (Doc. 96). However, Knox County also argues that it is the "wrong party" for Plaintiffs' claims because it does not administer detention policies at MDH or make individual hiring decisions. *Id.* at p. 4. Plaintiffs assert they have never contended the County manages day-to-day operations inside the facility; rather, the County has statutory responsibility to "support and maintain" MDH, including providing all supplies "necessary to maintain, operate and conduct" MDH. (Doc. 103 at p. 20) (citing 55 ILCS 75/1(a); 55 ILCS 75/3(a)-(d)). The County admits that this responsibility includes "approv[ing] budgets that include[] certain staffing levels" and "hiring individuals or independent contractors to provide necessary support services at the facility, including the Center's health care delivery system." (Doc. 96 at p. 8; Doc. 30 at p. 9). The County's alleged failure to provide needed mental health services at MDH, including appropriate staffing, makes it a proper Defendant for the claims of the putative class.

Plaintiffs' Second Amended Motion for Class Certification is GRANTED. Therefore, because Plaintiffs have demonstrated that certification is appropriate pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), the Court ORDERS that this case be

certified as a class action. The Court certifies a class comprised of all children who are currently, or in the future will be, detained in the Mary Davis Home.

## III.    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### A.  Legal Standard

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right"). "The purpose of a preliminary injunction is to preserve the status quo pending a final hearing on the merits." *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1330 (7th Cir. 1980).

In order to obtain a preliminary injunction, Plaintiffs have the burden of establishing that "(1) without this relief, [they] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [they have] some likelihood of prevailing on the merits of [their] claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (internal quotations and citation omitted). If Plaintiffs meet the first three requirements, then the Court balances the relative harms that could be caused to either party. *Incredible Tech., Inc. v. Virtual Tech., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005).

The Seventh Circuit has described the type of injunction Plaintiffs seek, where an injunction would require an affirmative act by Defendants, as a mandatory preliminary injunction. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Mandatory injunctions are "cautiously viewed and sparingly issued," because they require the court

to command the defendants to take a particular action. *Id.* (citing *Jordan v. Wolke,* 593 F.2d 772, 774 (7th Cir. 1978)).

In the context of prisoner litigation, the PRLA limits the scope of the Court's authority to enter an injunction in the corrections context. *Westefer v. Neal,* 682 F.3d 679, 683 (7th Cir. 2012) (citing 18 U.S.C. § 3626(a)(1)(A)). Under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." § 3626(a)(2); *see also Westefer,* 682 F.3d at 683 ("[T]he PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.") (internal quotation marks and citation omitted)).

The PLRA states that "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." § 3626(a)(2). "However, nothing in § 3626 prohibits the entry of successive orders for preliminary injunction if needed." *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1004 (C.D. Ill. 2009) (citing *Mayweathers v. Terhune,* 136 F. Supp. 2d 1152, 1154 (E.D. Cal. 2001) (successive preliminary injunctions to maintain status quo are consistent with § 3626(a)(2)).

### B. Analysis

Plaintiffs assert MDH, a pretrial detention facility for minors, routinely uses solitary confinement to punish detainees for extended durations ranging from many

hours to weeks or even months. Supporting declarations from current and former detainees describe the solitary confinement practices at MDH. (Doc. 9-1; Doc. 9-2; Doc. 9-3; Doc. 9-4; Doc. 33-1; Doc. 79 at pp. 6-13). The most common form of solitary confinement is called "Special Group Status" or "SGS," where minors are indefinitely locked alone in their cells for about twenty-three hours per day. MDH also imposes punitive solitary confinement as part of its "Behavioral Holds" or "Behavioral Plans," which can involve twenty-one to twenty-four hours per day of solitary confinement for days at a time. Plaintiffs assert that through at least 2023, MDH had dedicated an entire living wing of the facility, known as the "Harvest Wing," to solitary confinement. Plaintiffs contend that MDH places youth in solitary confinement for fighting and even minor infractions, such as refusing to follow staff directions, "talking back," or cursing. (Doc. 35 at p. 13).

Plaintiffs allege the physical environment youth experience in solitary confinement is torturous. For instance, children are allegedly forced to pass their days alone in a small concrete box with lights that never turn off, making it difficult to sleep. Staff do not tell detainees when they will be released from solitary confinement. Plaintiffs also allege they are subjected to invasive strip searches and violence from staff, punished for trying to talk to other youth, denied in-person family visits, and denied access to their schoolwork.

Additionally, Plaintiffs allege MDH places minors in solitary confinement without regard to their mental health history or how isolation might exacerbate their mental illness. Plaintiffs allege detainees in solitary confinement only receive brief "wellness checks" conducted by outside counselors every few days instead of face-to-face private

meetings. During the wellness checks, the counselors ask the minors a few questions through their cell door, within earshot of guards and other detainees. Plaintiffs allege the lack of mental healthcare is particularly harmful for youth who are on suicide watch or have mental health issues.

Plaintiffs seek an order to enjoin MDH's solitary confinement practices while this case is tried on the merits. Plaintiffs argue they are likely to succeed on the merits of their claims that Defendants' use of punitive solitary confinement violates their constitutional rights; that solitary confinement imposes irreparable harm for which there is no adequate remedy at law; and failure to enjoin the practice would cause harm outweighing any harm to Defendants from the granting of the requested injunction.

### 1. Substantial Likelihood of Success on the Merits

Plaintiffs argue they are likely to succeed on their claim that solitary confinement violates the Fourteenth Amendment. The Constitution protects children in juvenile justice facilities from excessive isolation. *See Reed v. Palmer*, 906 F.3d 540, 549-50 (7th Cir. 2018). The Fourteenth Amendment, which applies to pretrial detainees, prohibits conditions of confinement that are not rationally related to a legitimate government objective or that are excessive in relation to that objective. *Id.*; *Hardeman v. Curran*, 933 F.3d 816, 821-23 (7th Cir. 2019) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397-98 (2015)).

To show a likelihood of success, the Plaintiffs, at the threshold, "need only demonstrate a 'better than negligible chance of succeeding.'" *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir. 1999) (quoting *Boucher v. Sch. Bd. of Greenfield,* 134 F.3d 821, 824 (7th Cir. 1998)). To succeed on their Fourteenth Amendment deliberate indifference claim,

Plaintiffs must show: "(1) the conditions in question are or were objectively serious; (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, 'not rationally related to a legitimate governmental objective or…excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 827 (quoting *Kingsley*, 576 U.S. at 397-98).

Plaintiffs argue the use of solitary confinement at MDH is "objectively serious" because of the adverse impact it has on the minor detainees. In support of their assertion, Plaintiffs submitted a report from their expert, Dr. Louis Kraus, the Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago. (Doc. 33-3). According to Dr. Kraus, juveniles are "particularly vulnerable to a risk of significant psychological effects from solitary confinement," including, but not limited to, depression and suicide. *Id.* at p. 8, ¶¶ 14-24.

Regarding the subjective component of their Fourteenth Amendment claim, Plaintiffs argue Defendants "knowingly" used solitary confinement despite their awareness of the harm it caused. Plaintiffs also argue Defendants were aware that Illinois banned extended solitary confinement through the End Youth Solitary Confinement Act ("EYSCA"), which became effective on January 1, 2024. 730 ILCS 215/1. "The purpose of this Act is to end the use of solitary confinement for young detainees in detention centers for any purpose other than preventing immediate physical harm." *Id.* at 215/5. Defendants Steck and Pletz publicly and officially opposed the passage of the law. (Doc.

35 at p. 22 fn. 3). Additionally, the IDJJ published multiple audits criticizing MDH's use of punitive solitary confinement. (Docs. 9-5, 9-6, 9-7, 9-8).

Plaintiffs argue punitive solitary confinement practices are "not rationally related to a legitimate governmental objective." (Doc. 35 at p. 44). Plaintiffs' expert, Patrick Hurley, a corrections professional with thirty-six years of experience in detention settings, submitted a declaration explaining how punitive solitary confinement is unnecessary for facility security and counterproductive because it leads to a cycle of escalating conflict and violence for the minors and staff members. (Doc. 33-6). Plaintiffs assert that even if placing minors in solitary confinement were "rationally related" to a government objective, MDH's practices are excessive. (Doc. 35 at p. 45).

Defendants argue Plaintiffs are unlikely to succeed on the merits of their claim based on applicable defenses. Specifically, Defendants assert that (1) Plaintiffs failed to exhaust their administrative remedies; (2) Plaintiffs lack standing and their claims are moot; (3) Eleventh Amendment sovereign immunity applies; and (4) Plaintiffs' requested relief does not comply with the PLRA. (Doc. 52).

### a. Exhaustion of Administrative Remedies

Defendants argue the PLRA bars Plaintiffs' action because they failed to exhaust their administrative remedies. *See Kalinowski v. Bond*, 358 F.3d 978, 979 (7th Cir. 2004) (explaining pretrial detainees are "prisoners" for purposes of the PLRA). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo*, 286 F.3d at 1025. Defendants attached MDH's grievance policy, identified as Policy Number 13.1, to their Response. (Doc. 52-2

at pp. 148-151). It states that within twenty-four hours of filing a grievance, a staff member will "[c]onfirm receipt of the grievance form with the [detainee] who filed the grievance." *Id.* at p. 149, ¶6a. Defendants admit J.B.H. filed a grievance about the claims in this case on May 26, 2024, but they argue the grievance was not exhausted before he filed the Complaint on May 28, 2024. (Doc. 53-4). Plaintiffs argue J.B.H.'s grievance was exhausted because MDH officials did not respond to his grievance within twenty-four hours in accordance with Policy Number 13.1.

Defendants do not dispute that MDH staff failed to provide any response—written or otherwise—within the allotted time. J.B.H. filed this lawsuit after the expiration of MDH's time to respond to the grievance. Because there was no response, J.B.H. had nothing to appeal. *See Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008) ("if [a prisoner] did submit a grievance but received no ruling, he was not required to file an appeal."); *Roberts v. Neal*, 745 F.3d 232, 236 (7th Cir. 2014) (prisoner "never received a response from the warden, and so didn't have to do anything further to keep his grievance alive").

Defendants also claim Plaintiff A.M. did not file any grievances. Plaintiffs assert A.M. filed a grievance on June 7, 2024, but Defendants failed to retain a copy of it in their file and did not respond within twenty-four hours. (Doc. 69 at p. 6, ¶ 5). Plaintiffs contend A.M. filed the Amended Complaint on June 11, 2024, after the expiration of MDH's time to respond to the grievance.

On April 29, 2025, Plaintiffs filed a Supplemental Pleading which added J.L.S. as a Plaintiff. (Doc. 79). J.L.S. filed a grievance on March 11, 2025. (Doc. 83-6). Defendants argue J.L.S. failed to exhaust his administrative remedies because there is no evidence he

submitted a relevant grievance before filing the Amended Complaint on June 11, 2024. (Doc. 79).

Here, the Court finds the affirmative defense of exhaustion does not negate Plaintiffs' likelihood of success on the merits of their claims, at least at this early stage. Ruling on the exhaustion issue before the parties have had an opportunity to fully brief and argue the issue would be premature. The Court finds Defendants' affirmative defense does not present a bar to the preliminary injunction in a class action. *See Jones v. Berge*, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001) (citing *Smith v. Zachary*, 255 F.3d 446, 449 (7th Cir. 2001)) ("[T]he goals of the [PLRA's] exhaustion requirement are not compromised by not requiring every class member to exhaust. As long as prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons.").

### b. Mootness and Standing

Second, Defendants assert Plaintiffs lack standing for prospective injunctive relief. "To have standing for prospective injunctive relief, a plaintiff must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017) (citations omitted) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). A case is moot when (1) "the issues presented are no longer live" or (2) the parties lack a "legally cognizable interest in the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (citation omitted). The Supreme Court has recognized an exception to mootness in cases where

the claims are either "capable of repetition, yet evad[e] review," or where the class is so inherently transitory that they are unlikely to still have a live claim by the time the court adjudicates it. *See Sosna v. Iowa*, 419 U.S. 393, 401 (1975) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (1972)).

Both the Supreme Court and Seventh Circuit have recognized the "inherently transitory exception" to the mootness doctrine applies to claims filed by pretrial detainees. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *Olson*, 594 F.3d at 582. A claim must meet two elements for the exception to apply: "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of person suffering the deprivation complained of in the complaint." *Id.* (citing *Gerstein*, 420 U.S. at 110 n. 22). Plaintiffs argue the first prong is established because youth are temporarily detained at MDH. Regarding the second prong, Plaintiffs argue there remains a putative class of youth currently incarcerated at MDH and subject to Defendants' confinement policies and inadequate mental health treatment. The Court agrees the inherently transitory exception applies. As the Court stated above, Plaintiffs and potential class members are comprised of minors who are detained for often short and unpredictable periods of time. Additionally, there will be a continuous class of detainees entering and exiting the facility who could be subjected to MDH's solitary confinement practices.

Defendants also argue relief cannot be granted to a class prior to class certification and that J.B.H. and A.M. are inadequate class representatives because they were released from MDH. These arguments are moot due to the certification of the class.

### c.   Eleventh Amendment Sovereign Immunity

Third, Defendants assert Plaintiffs' claims are barred by the Eleventh Amendment, which precludes an award of injunctive relief against a state actor absent a showing of an ongoing constitutional violation. Defendants argue Plaintiffs seek injunctive and declaratory relief from State officials in their official capacities, meaning that the suit is technically a suit against the State of Illinois. (Doc. 52 at pp. 28-29).

Plaintiffs argue their claims are not barred by sovereign immunity because the *Ex parte Young* doctrine applies. The *Ex parte Young* exception to sovereign immunity allows private plaintiffs to sue state officials in their official capacities for prospective relief to stop ongoing violations of federal law. *Ex parte Young*, 209 U.S. 123 (1908). To determine whether the *Ex parte Young* doctrine applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1051 (7th Cir. 2013) (citation omitted).

Here, Plaintiffs seek only prospective relief against Defendants and allege ongoing violations of federal constitutional law—specifically, the Fourth, Eighth, and Fourteenth Amendments. Thus, Plaintiffs' claims are not barred by the Eleventh Amendment.

### d.   Prison Litigation Reform Act (PLRA)

Fourth, Defendants argue the PLRA bars the relief Plaintiffs seek because their requested relief is overly broad. (Doc. 52 at pp. 29-30). Plaintiffs assert the PLRA does not prevent the Court from issuing their requested injunctive relief if the Court finds that the relief complies with the PLRA.

Regarding preliminary injunctive relief, the PLRA states:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

§ 3626(a)(2). Plaintiffs' Motion seeks preliminary relief in the form of an injunction that prohibits MDH from taking the following actions:

(a) Youth detained at Mary Davis Home shall not be placed in solitary confinement—defined as the restriction of a youth alone in a cell, room, or other area, excluding the confinement of a youth to such an area during normal sleeping hours—except as a temporary response to prevent imminent physical harm to a person or persons, with that confinement to cease immediately upon cessation of that threat of harm.

(b) Youth detained at Mary Davis Home who are identified as being at risk of suicide or self-harm shall not be placed in solitary confinement, and defendants shall present to the Court, within a time frame to be determined by the Court, a plan for provision of appropriate supervision and prompt, individualized emergency mental health intervention to such youth promptly after the youth is identified as being at risk for suicide or self-harm.

(Doc. 33 at pp. 2-3). Plaintiffs also ask the Court to make appropriate findings required under the PLRA to support preliminary relief and to renew this preliminary relief every ninety days until there has been a trial on the merits. *Id.* at p. 3.

Other courts have made similar findings in cases involving solitary confinement of detained minors. *See J.J. v. Litscher*, No. 3:17-cv-47 (W.D. Wis. July 10, 2017) (preliminary injunction) (Doc. 33-7); *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 590 (N.D.N.Y. 2017) (granting motion for preliminary injunction and enjoining defendants from imposing 23-hour disciplinary isolation on juvenile detainees); *A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 418 (N.D.N.Y. 2018) (same). The PLRA does not bar Plaintiffs' requested relief. Even if the Court were to find that the exact relief Plaintiffs requested does not meet the requirements of the PLRA, that would not "bar" Plaintiffs' request. Instead, it would require the Court to revise the requested relief to fit the parameters of the PLRA.

In sum, despite Defendants' affirmative defenses, Plaintiffs adequately demonstrated a likelihood of success on the merits. Objectively, Plaintiffs presented substantial, compelling evidence that minors detained at MDH face a serious risk of harm when subjected to Defendants' solitary confinement practices, especially minors who suffer from mental health conditions and who are on suicide watch. Furthermore, Plaintiffs established that Defendants have been on actual notice of the serious risks of harm solitary confinement poses based of receiving multiple complaints from detainees, the passage of the EYSCA, multiple audits by the IDJJ, and the filing of this lawsuit. As such, Plaintiffs have demonstrated some likelihood of prevailing on the merits of their claims. *See Speech First, Inc.*, 968 F.3d at 637.

2. **Irreparable Harm**

To succeed on their Motion, Plaintiffs must also show they will suffer irreparable harm if the Court does not grant a preliminary injunction. "Irreparable harm means that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial." *Jones,* 164 F. Supp. 2d at 1123 (citing *Vogel v. Am. Soc'y of Appraisers,* 744 F.2d 598, 599 (7th Cir. 1984)). "The purpose of preliminary injunctive relief is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.,* 149 F.3d 722, 726 (7th Cir. 1998) (internal quotation marks and citation omitted).

Plaintiffs argue solitary confinement is profoundly harmful to youth, especially to the minor detainees at MDH. (Doc. 35 at pp. 19-20). Plaintiffs present a plethora of evidence regarding the harm solitary confinement allegedly causes. Plaintiffs' expert, Dr. Kraus, opined minors subjected to MDH's solitary confinement policies "are at a substantial risk of serious harm to their social, psychological, and emotional development." (Doc. 33-3 at ¶ 48). According to Dr. Kraus, subjecting the youth at MDH, who are "still developing socially, psychologically, and neurologically," to solitary confinement makes them "especially susceptible to psychological harm." *Id.* at ¶¶ 15, 22. The risk of solitary confinement in settings like MDH "is amplified by the disproportionately high incidence of preexisting mental illness among children involved in the juvenile justice system," which is estimated between sixty and seventy-five percent. *Id.* at ¶ 17. According to Dr. Kraus, solitary confinement causes long-term harm, including depression, low self-esteem, vegetative features, and permanent psychiatric

symptoms like paranoia and anxiety. *Id.* at ¶¶ 20, 22. There is a high correlation between juvenile suicide and the use of solitary confinement in detention, even for a short time — fully half of children who committed suicide in juvenile facilities were in isolation at the time of their death, with forty percent of those suicides occurring within the first seventy-two hours of solitary confinement. *Id.* at ¶ 16.

Dr. Kraus visited MDH, conducted a comprehensive mental status exam and clinical review of Plaintiffs and each of the youth declarants in this action and administered a series of diagnostic assessments of each youth. *See id.* at ¶ 12. They each described MDH's confinement practices to Dr. Kraus in detail and discussed the impact those practices had on them personally. Dr. Kraus's interviews "repeatedly demonstrated that these children experience symptoms correlated with the use of solitary confinement." *Id.* at ¶ 34. His evaluations revealed symptoms of "depression and increased depressive symptoms, anxiety and increased anxiety, agitation and increased agitation, distrust of others, anger, sadness, feeling overwhelmed, suicidal thoughts, attempting suicide, and PTSD." *Id.* Kraus noted MDH's solitary confinement of youth with mental illness, including youth who were suicidal or otherwise in mental health crisis, and denial of meaningful mental healthcare to those children, was especially harmful and a gross departure from professional standards. *Id.* at ¶¶ 42–47.

In their Response, Defendants argue Plaintiffs are seeking relief "early" and asking the Court to "grant them all their relief now." (Doc. 52 at p. 10). Defendants also argue changes made to MDH's Policy and Procedure Manual in February 2025 negate the need for a preliminary injunction. (Doc. 52-2). Defendants contend their policies and

procedures are objectively reasonable and exceed constitutional minimums. (Doc. 73 at p. 12). Defendants also assert Plaintiffs' request to require them to present a plan for provision of appropriate supervision and prompt, individualized emergency mental health intervention to detainees who are identified as being at risk of suicide or self-harm is moot because MDH's current policies regarding screening and prevention of suicide and self-harm are already objectively reasonable. *Id.* at pp. 12-13.

Since the filing of Defendants' Response, the MDH Policy Manual has undergone further review and revisions. On September 4, 2025, Defendants filed the now-current version of the MDH Policy Manual. (Doc. 94-11).

The alleged cessation of MDH's objectionable practices is relevant in determining whether a substantial risk of irreparable harm is present. *See Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999) (cessation of illegal conduct does not render claim moot but may affect availability of injunctive relief because it may "impact[] ability to show substantial and irreparable harm"). Here, however, the risk of irreparable harm remains present, as declarations from minor detainees indicate that the extended punitive confinement practices have continued, even after this lawsuit was filed. (Docs. 69-35, 69-40, 69-41). Their declarations demonstrate that youth have been confined to their cells for over twenty-two hours a day in late 2024 and early 2025. Additionally, J.W. spent approximately four months in solitary confinement during his detention at MDH from December 2023 to July 2024 and attempted suicide twice. When staff responded to his first attempt, guards forcibly cut his clothing, left him naked on the concrete floor, gave him an anti-suicide smock to wear, and took his books. Plaintiffs allege J.W. never

received emergency intervention from mental health professionals. Counselors conducted "wellness checks," which consisted of a counselor asking J.W. through his cell door if he still felt suicidal. On an unknown date, a guard allegedly opened J.W.'s cell door and allowed multiple other detainees to beat J.W. while the guard recorded the beating on a mobile device and posted it to social media. (Doc. 33-1).

Here, the Court finds Plaintiffs submitted sufficient evidence that Defendants' continued use of solitary confinement is causing, and will continue to cause, a serious risk of both short-term and long-term physical and psychological damage. In prison cases, unnecessary pain and suffering constitute "irreparable harm" sufficient to support a preliminary injunction. *Jones*, 164 F. Supp. 2d at 1123 (finding conditions in segregation facility posed grave risk of irreparable harm to seriously mentally ill inmates). The harm that solitary confinement causes for minors is widely recognized. *See V.W.*, 236 F. Supp. 3d at 568 (describing an "emerging consensus [in 2017] among professional organizations in the corrections field" that disciplinary isolation of juveniles is "an ineffective disciplinary technique for restoring facility security and is in fact counterproductive to facility discipline and security"). Courts in recent cases across the country have followed suit, weighing children's unique vulnerabilities to serious harm when assessing the constitutionality of isolation. *See J.H. v. Williamson Cnty., Tenn.*, 951 F.3d 709, 718 (6th Cir. 2020) ("A growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement."); *C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 909 (S.D. Iowa 2020) ("Due to their traumatic backgrounds and mental health issues, juveniles in detention facilities are 'exquisitely vulnerable to

psychiatric and behavioral decompensation when housed in solitary confinement.'") (internal citation omitted); *G.H. by & through Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1116 (N.D. Fla. 2019) (finding plaintiffs alleged sufficient facts to show the practice of isolating children "violates contemporary standards of decency" due to "children's heightened vulnerability and continued physical, psychological, and social development"); *A.T.*, 298 F. Supp. 3d at 416 (granting preliminary injunction to class of children in an adult facility, finding "defendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage"); *V.W.*, 236 F. Supp. 3d at 583 (enjoining disciplinary isolation of children in an adult facility and relying on "broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults"); *Doe by & through Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017) (holding "solitary confinement of juveniles in government custody for punitive or disciplinary reasons, especially for extended periods of time and especially for youth who may suffer from mental illness" is unconstitutional).

According to the United States' Statement of Interest in support of Plaintiffs' Motion for Preliminary Injunction, the federal government has also recognized that children are developmentally and constitutionally different than adults and that excessive isolation causes children unique and significant harm. (Doc. 28). In 2018, Congress passed the First Step Act, which prohibits the use of isolation on children in federal facilities "for discipline, punishment, retaliation, or any reason other than as a temporary response to a covered juvenile's behavior [that] poses a serious and immediate

risk of physical harm to any individual, including the covered juvenile." 18 U.S.C. § 5043(b)(1).

Although the revised MDH Policy Manual is a step in the right direction, the overwhelming evidence Plaintiffs have presented shows that the solitary confinement practices at MDH have continued. (Doc. 70). Consequently, the Court finds Plaintiffs have made a strong showing of irreparable harm. This element weighs in favor of granting a preliminary injunction. *See Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) ("The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction.") (citation and internal quotation marks omitted)).

### 3. Traditional Legal Remedies are Inadequate

The inquiries into irreparable harm and whether Plaintiffs have an adequate remedy at law are closely linked. *See Tay v. Dennison,* 457 F. Supp. 3d 657, 686 (S.D. Ill. 2020) (citing *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017)); *Jones*, 164 F. Supp. 2d at 1123. Harm is "irreparable" when an award of money damages cannot adequately compensate Plaintiffs for their injuries. *See Tay,* 457 F. Supp. 3d at 686; *Am. Hosp. Supply v. Hosp. Products Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) ("The premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole . . . .").

Plaintiffs have demonstrated a substantial risk of irreparable harm for which there is no adequate remedy at law. Money damages cannot adequately remedy the harm that minors detained at MDH face. *See Godinez v. Lane*, 733 F.2d 1250, 1258 (7th Cir. 1984); *see*

*also Tay,* 457 F. Supp. 3d at 687-88 (finding plaintiff's mental health was at risk of irreparable harm and granting preliminary injunction noting that "money will not make Plaintiff whole or protect her from physical and emotional abuse"); *Farnam*, 593 F. Supp. 2d at 1013 (granting preliminary injunction for prisoner's medical treatment where money damages would be inadequate).

### 4. Balance of Hardships and the Public Interest

Finally, the Court must "balance[] the potential harms to the parties and, if appropriate, the public interest." *Farnam*, 593 F. Supp. 2d at 1004 (citations omitted). "[C]ourts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter*, 555 U.S. at 24 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "[U]pholding constitutional rights serves the public interest." *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). The public interest generally supports an award of preliminary injunctive relief when a plaintiff has demonstrated both a likelihood of success on the merits and irreparable harm. *See V.W.*, 236 F. Supp. 3d at 57 (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

Here, the balance of equities favors injunctive relief because the public interest is not served by confining minors in conditions where they face a risk of irreparable psychological damage and, in some cases, a risk of self-harm and suicide. "The public interest generally supports a grant of preliminary injunctive relief where, as here, a plaintiff has demonstrated a substantial likelihood of success on the merits and a strong showing of irreparable harm. This interest is particularly strong where the rights to be

vindicated are constitutional in nature." *A.T.*, 298 F. Supp. 3d at 417 (citing *Ligon v. City of N.Y.*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution.")). The Court sees no detrimental effect on the public interest by issuing this preliminary injunction. To the contrary, the public has an interest in ensuring the minors detained at MDH are not harmed by being held in extended punitive solitary confinement. It is undisputed that Defendants have a strong interest in maintaining the safety and security at MDH, but the Court sees no burden on public safety or the operation of the criminal justice system, especially because Defendants are already required to comply with the EYSCA. Accordingly, the balance of hardships and public interest will be served by granting a preliminary injunction.

### 5. Preliminary Injunctive Relief

Plaintiffs have shown a substantial likelihood of success on the merits of their claims and demonstrated that the other relevant factors weigh in their favor. Accordingly, their request for a preliminary injunction is GRANTED. The Court has considered the requirements of § 3626(a)(2) in entering this Order, as well as the requirements of comity set forth in § 3626(a)(1)(b), and has given due weight to any adverse impact on public safety and the operation of the criminal justice system caused by the preliminary relief. The Court finds the relief granted by this preliminary injunction is narrowly drawn and extends no further than necessary to correct the harm to the detainees at MDH warranting preliminary relief and is the least intrusive means of correcting the ongoing harm. The Court will renew this preliminary injunction every ninety days as needed, until there has been a trial on the merits and a permanent injunction has been entered. § 3626(a)(2).

**IT IS THEREFORE ORDERED:**

1.      Plaintiffs' Second Amended Motion for Class Certification [88] is GRANTED. The class is defined as "all children who are currently, or in the future will be, detained in the Mary Davis Home." Accordingly, this class is CERTIFIED. Plaintiffs J.B.H., A.M., and J.L.S. are appointed as representative Plaintiffs of the class. Plaintiffs' current counsel are hereby appointed as counsel for the class. The Court DIRECTS class counsel to provide notice of this certification to each individual member of the class who can be identified through reasonable effort.

2.      Plaintiffs' Motion for Preliminary Injunction [33] is GRANTED. Defendants, along with their officers, agents, affiliates, subsidiaries, servants, employees, successors, assigns, those persons in active concert or participation with Defendants, and all other persons within the scope of Federal Rule of Civil Procedure 65, are hereby IMMEDIATELY ENJOINED AND RESTRAINED, pending the final determination of this action, from taking the following actions:

      a.      Youth detained at Mary Davis Home shall not be placed in solitary confinement—defined as the restriction of a youth alone in a cell, room, or other area, excluding the confinement of a youth to such an area during normal sleeping hours—except as a temporary response to prevent imminent physical harm to a person or persons, with that confinement to cease immediately upon cessation of that threat of harm.

      b.      Youth detained at Mary Davis Home who are identified as being at risk of suicide or self-harm shall not be placed in solitary confinement, and Defendants shall present to the Court, within 30 days of this Order, a plan for provision of appropriate supervision and prompt, individualized emergency mental health intervention to such youth promptly after the youth is identified as being at risk for suicide or self-harm.

3.      Pursuant to 18 U.S.C. § 3626(a)(2), this preliminary injunction expires 90 days from the entry of this Order. This matter is scheduled for a status conference on January 6, 2026 at 10:00 A.M. by video to discuss the need for the entry of a successive preliminary injunction. The Clerk is directed to file video conferencing instructions.

4.      Within 21 days of this Order, the parties are directed to file a proposed schedule for discovery and dispositive motions.

ENTERED September 30, 2025.

s/ *Colleen R. Lawless*

_____

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE